**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

ANTHONY MITCHELL, et al.

               Plaintiffs,

   v.

CITY OF HENDERSON, et al.,

              Defendants.

Case No. 2:13-cv-01154-APG-CWH

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

(Dkt. No. 17)

## I.    BACKGROUND

The three plaintiffs—Michael and Linda Mitchell (the "Parents") and their adult son Anthony Mitchell—filed this suit in response to events occurring in and around their respective homes at 362 and 367 Eveningside Avenue in Henderson, Nevada.[1]  The Plaintiffs allege the following facts.

Sometime between 8:30 and 9:30 a.m. on July 10, 2011, officers of the Henderson Police Department ("HPD") and the North Las Vegas Police Department ("NLVPD") arrived outside the Plaintiffs' houses in response to a domestic violence call from the wife of a neighbor, Mr. White.[2]  White telephoned Michael as the police arrived, and he left a voicemail informing Michael of the police arrival and that White's wife had told the police that he had assaulted her.  Michael called White back, and White told him that White refused to exit his house to discuss the alleged abuse with the police; he contended that his one-month-old child was asleep in the house and that he could not leave the child alone.[3]  White asked the officers to come inside instead.[4]  White left the

---

[1] (First Am. Compl. ("FAC") ¶¶ 21, 25, Dkt. No. 3.)

[2] (FAC ¶ 21.)

[3] (FAC ¶ 22.)

[4] (*Id.*)

front door open and sat on his couch in view of the officers; he was apparently unarmed.[5]  The officers called for backup, which arrived in the form of additional personnel, including a SWAT team.[6]  Sirens blared, a bullhorn sounded, and SWAT officers tore a tree from the ground in White's front yard.  When Michael left his house to retrieve the morning newspaper, several officers commanded him to return inside.[7]  Agitated, Michael shouted for the officers to turn their sirens off.[8]

Around this time, the Plaintiffs began to photograph the police officers through the windows of their homes, concerned that the officers' behavior was inappropriate.[9]  The Plaintiffs intended to communicate the ongoing events to local news outlets, and the officers were aware of that intent.[10]  Doe Officers 1–10 pointed firearms at the Plaintiffs through their windows and at the homes of several neighbors.[11]  When Michael photographed Doe Officer 1—a member of the NLVPD SWAT team—through a window of Michael's home, that officer pointed his firearm at Michael.

At about 10:45 a.m., Anthony received a phone call from HPD Officer Christopher Worley, who asked Anthony to allow the police to use his house to gain a "tactical advantage" over White.[12]  Anthony rejected this request, and Officer Worley ended the call.[13]  Anthony "was extremely troubled and concerned for his safety based on Officer Worley's insistence about entering his home without a warrant, and became concerned that serious police misconduct was taking place and that armed police would attempt to enter his home without a warrant."[14]

---

[5] (FAC ¶ 22.)

[6] (FAC ¶ 29.)

[7] (FAC ¶¶ 23–27, 29.)

[8] (FAC ¶ 27.)

[9] (FAC ¶ 28.)

[10] (FAC ¶¶ 28, 45.)

[11] (FAC ¶¶ 29, 30, 33, 36, 46, 47.)

[12] (FAC ¶ 35.)

[13] (*Id.*)

[14] (FAC ¶ 37.)

1   Officers continued to point weapons at Anthony through his windows. [15]  Due to what he

2   perceived as the recklessness with which the officers were handling loaded firearms, he put on the

3   protective ballistic vest he used in his employment as a bail enforcement agent.[16]

4         After attempting to contact a local news agency between 11:30 a.m. and shortly before

5   noon, Anthony walked back and forth in front of his window.[17]  As he did so, Doe Officers 1–10

6   pointed their weapons at him.  Doe Officer 2 followed Anthony's movements through the sight of

7   his firearm.[18]  Anthony photographed Doe Officer 2 and then gave him the middle-finger

8   gesture.[19]

9         At this point Doe Officers 1–10 (including NLVPD Officers Waller and Cawthorn and

10  HPD Officer Worley) conspired to remove Anthony from his residence and occupy it for their

11  own use.[20]  Plaintiffs cite Officer Cawthorn's "official report" to support this conspiracy

12  allegation:

13         It was determined to move to 367 Eveningside and attempt to contact [Anthony]
       Mitchell.  If [Anthony] Mitchell answered the door he would be asked to leave.  If

14         he refused to leave he would be arrested for Obstructing a Police Officer.  If
       [Anthony] Mitchell refused to answer the door, force entry would be made and

15         [Anthony] Mitchell would be arrested.[21]

16        Just before noon, Doe Officers 1–10 (including NLVPD Officers Waller, Albers,

17  Cawthorn, Rockwell, and Snyder) banged on Anthony's door and "loudly yelled 'resident 367

18  come to the door.'"[22]  Surprised, Anthony called his mother and explained to her that the police

19  were at his door.[23]  The officers then knocked down Anthony's door with a metal ram and entered

20

---

21       [15] (FAC ¶ 36.)

22       [16] (*Id.*)

23       [17] (FAC ¶¶ 40–44, 46.)

     [18] (FAC ¶ 46.)

24       [19] (FAC ¶ 47.)

25       [20] (*Id.*)

26       [21] (*Id.*)

27       [22] (FAC ¶ 48.)

     [23] (FAC ¶ 49.)

28

his house, without a warrant or Anthony's permission.[24]  They pointed their guns at Anthony and ordered him to the floor.[25]  The officers, including Officer Snyder, addressed Anthony as "asshole" and ordered him to crawl toward them and shut his phone off.[26] Anthony stayed huddled on the floor with his hands over his face.[27]

Doe Officers 1–10 (including Officer Cawthorn) then shot Anthony with "pepperball" rounds at close range.  Anthony was struck at least three times, causing injury and pain through both the impact of the rounds and the effects of the caustic chemical.[28]  The officers also shot Anthony's dog Sam, who had been cowering in the corner of the room, with at least one "pepperball" round.[29]  Sam panicked, howled in pain, and fled from the house.  He ended up trapped in a fenced alcove in the backyard without food or water for nearly the entire day in 100-degree heat.

Doe Officers 1–10 then hung up Anthony's phone—over which his mother had been listening to the traumatic events in Anthony's home unfold—without telling Linda what was happening.  The sudden hang-up caused Linda great emotional distress through the belief that Anthony had been wounded or killed.[30]  Next, the officers (including Officer Cawthorn) dragged Anthony outside, pressed him against a wall, handcuffed him, and forcibly escorted him to the Mobile Command Center.[31]  During these events, one of Doe Officers 1–10 said to Anthony, "you wanna flip us off, huh?"  In apparent response, one officer said "shhhh" to another.[32]  A

---

[24] (FAC ¶ 50.)

[25] (FAC ¶ 51.)

[26] (FAC ¶ 53.)

[27] (FAC ¶ 54.)

[28] (FAC ¶¶ 55–56.)

[29] (FAC ¶ 57.)

[30] (FAC ¶¶ 57–58.)

[31] (FAC ¶¶ 61, 63.)

[32] (FAC ¶ 62.)

short time later, at the Command Center, HPD Officer Angela Walker arrested Anthony on charges of obstructing a police officer.[33]

Multiple officers, including Doe Officers 1–10 and NLVPD Officers Waller, Albers, Rockwell, and Snyder, "then swarmed through . . . Anthony's home . . . , searching through his rooms and possessions and moving his furniture, without permission or a warrant, and then subsequently occupied it and used it as an observation post to surveil [White's] house."[34]

Meanwhile, across the street at approximately 11:25 a.m., Doe Officers 11–20 entered the Parents' backyard without a warrant or permission.[35]  The officers led Michael from his house to the Mobile Command Center under the "guise" that he was needed to negotiate with White on the phone.[36]  Shortly after Michael left, Linda received the aforementioned call from Anthony explaining that the police were at his front door.[37]

Approximately 30 minutes later, Doe Officers 21–30 entered the Parents' backyard, again without a warrant or permission.[38]  The officers knocked on the back door and demanded that Linda open the door.[39]  Linda complied, but told them that they could not enter without a warrant.[40]  The officers ignored her, entered through the back door, and began searching the home.[41]  Doe Officer 21 (a female) forcibly grabbed Linda, began to pull her out of the house, seized her purse and "began rummaging through it" without consent.[42]

---

[33] (FAC ¶¶ 59–61, 63, 64.)

[34] (FAC ¶ 67.)

[35] (FAC ¶ 68.)

[36] (*Id.*)

[37] (*Id.*)

[38] (FAC ¶ 69.)

[39] (*Id.*)

[40] (FAC ¶ 70.)

[41] (FAC ¶¶ 70, 71.)

[42] (FAC ¶ 71.)

Next, Doe Officer 22 (a male) grabbed Linda, pulled her out of the house, and passed her off to Doe Officer 23 (a female).  Doe Officer 23 dragged Linda, who was protesting, up the street to the Mobile Command Center where Michael and Anthony had been taken.[43]  Linda is "physically frail" and had difficulty breathing due to the heat and the swift pace.[44]  Doe Officer 23 ignored Linda's pleas to slow down and refused to explain why Linda was needed at the Command Center or why the police had entered her home.

Once Linda was spirited away by Doe Officer 23, Doe Officers 21–22 and 24–30 occupied the Parents' house.  The officers searched through cabinets and closets and drank from the water dispenser, evidenced by about 15 newly-disposed plastic cups in the kitchen trashcan.  They left the bedroom sliding glass door open and the refrigerator door ajar; they also spilled condiments on the kitchen floor.  Further, they opened and searched, without a warrant or permission, two trucks parked in the Parents' driveway—one belonging to Anthony, the other to Michael.[45]

At the Mobile Command Center, Michael attempted to return home once it was evident that White was not taking any calls from the Command Center and that the police would not allow Michael to call White from his own cell phone.[46]  The officers in the Command Center, however, informed Michael that he was not allowed to go home.[47]  Michael left the Command Center and headed down Mauve Street to exit the neighborhood.[48]  After walking for only a few minutes, an HPD patrol car pulled up next to him, and the officer inside told Michael that his wife would meet him back at the Command Center.  Based on this information, Michael reversed course back to the Command Center.[49]

_____

[43] (FAC ¶ 72.)

[44] (*Id.*)

[45] (FAC ¶¶ 73, 74.)

[46] (FAC ¶ 75.)

[47] (FAC ¶ 75.)

[48] (FAC ¶ 76.)

[49] (*Id.*)

1    Michael met Linda at the Mobile Command Center, shortly after she had witnessed

2    Anthony's arrest.[50]  Michael attempted to again leave the Command Center to meet up with

3    another of his sons (James) at the police barricade.[51]  But his plan was thwarted when he was

4    arrested, handcuffed by Doe Officer 31, and placed in the back of a marked police car with the

5    windows closed.  The midday July heat quickly became dangerous and oppressive.[52]  Michael

6    begged the officers to roll down the windows; they ignored him.  One of Doe Officers 31–35

7    turned on the air conditioning for the front seats, but a safety partition prevented the cold air from

8    reaching the back seats.  This officer refused to open the rear air vents.  Michael became

9    desperate and afraid for his life.  He "positioned himself to kick the rear door open" and "[o]nly at

10   this time did an officer outside the vehicle open the back door and . . . partially roll down the

11   windows."[53]

12    Anthony and Michael were jailed at the Henderson Detention Center for the night on

13   charges of Obstructing an Officer.[54] They were detained for at least nine hours before being

14   released on bond.[55]  During the jail stay, Doe Officers 36 and 37 withheld from Anthony seizure

15   medication.  Anthony submitted a prisoner grievance form requesting the medication from the jail

16   staff or, in the alternative, that his brother be allowed to deliver the medication to the jail.  That

17   request was ignored.  By 4:00 p.m., his brother delivered the medication.[56]  Although Anthony

18   did not suffer a seizure in jail, he suffered "great fear and anxiety that he might have a seizure

19   while in custody."[57]

20

21

22   [50] (FAC ¶ 77.)

23   [51] (Id.)

     [52] (FAC ¶¶ 77, 81–82.)

24   [53] (FAC ¶ 82.)

25   [54] (FAC ¶ 83.)

26   [55] (Id.)

     [56] (FAC ¶¶ 84–87.)

27   [57] (FAC ¶ 88.)

28

1   After the events of that day, Officers Worley, Walker, and Cawthorn prepared police

2   reports containing knowingly false statements, intending that the reports would be used to

3   prosecute Anthony and Michael.[58]  On July 13, 2011, Henderson Deputy City Attorney Janette

4   Reyes-Speer filed criminal complaints against Anthony and Michael in the Municipal Court of

5   the City of Henderson,[59] charging them with Obstructing an Officer and Failure to Obey Police

6   Officer.[60]  In November, 2011, the criminal complaints were dismissed with prejudice.[61]  With

7   regard to the criminal charges, the Plaintiffs allege that Doe Officers 38–45, HPD Officers

8   Walker and Worley, and NLVPD Officer Cawthorn caused Anthony and Michael "to be jailed

9   and caused criminal complaints to issue against them in order to violate their constitutional rights,

10   to provide cover for Defendants' wrongful actions, to frustrate and impede Plaintiffs' ability to

11   seek relief for those actions, and to further intimidate and retaliate against Plaintiffs."[62]

12   On July 1, 2013, the Plaintiffs filed their Complaint initiating this lawsuit.[63]  On October

13   14, they filed their First Amended Complaint ("FAC").[64]  The FAC names as defendants:

(1) City of Henderson;
(2) Jutta Chambers, Chief of the HPD, in her individual and official capacities;
(3) Garrett Poiner, HPD officer, in his individual and official capacities;
(4) Ronald Feola, HPD officer, in his individual and official capacities;
(5) Ramona Walls, HPD officer, in her individual and official capacities;
(6) Angela Walker, HPD officer, in her individual and official capacities;
(7) Christopher Worley, HPD officer, in his individual and official capacities;
(8) Janette Reyes-Speer, Deputy City Attorney, City of Henderson, in her individual capacity;[65]
(9) City of North Las Vegas;
(10) Joseph Chronister, Chief of the NLVPD, in his individual and official capacities;
(11) Michael Waller, NLVPD sergeant, in his individual and official capacities;

---

[58] (FAC ¶¶ 89–91.)

[59] Case Nos. 11-CR-9103 and 11-CR-9104.

[60] (FAC ¶ 94.)

[61] (FAC ¶ 95.)

[62] (FAC ¶ 96.)

[63] (Compl., Dkt. No. 1.)

[64] (Dkt. No. 3.)

[65] Defendants 1–8 are collectively referred to as the "Henderson Defendants."

(12) Drew Albers, NLVPD officer, in his individual and official capacities;
(13) David Cawthorn, NLVPD officer, in his individual and official capacities;
(14) Eric Rockwell, NLVPD officer, in his individual and official capacities;
(15) Snyder (first name unknown), NLVPD officer, in his individual and official capacities;[66]
(16) Doe Officers 1–40; and
(17) Roe Corporations 1–40.

The FAC pleads twenty-two claims for relief. The first twelve are brought under 42 U.S.C. § 1983 and two related federal statutes:

(1) Retaliation in violation of the Free Speech Clause of the First Amendment, against all defendants;
(2) Unlawful arrest of Anthony Mitchell and unlawful search of Anthony's home and vehicle, in violation of the Fourth Amendment, against Doe Officers 1–10, 21–22, 24–30, Sergeant Waller, and Officers Albers, Cawthorn, Rockwell, and Snyder;
(3) Excessive force against Anthony Mitchell, in violation of the Fourth Amendment, against Doe Officers 1–10, Sergeant Waller, and Officers Albers, Cawthorn, Rockwell, and Snyder;
(4) Unlawful arrest of Michael Mitchell, in violation of the Fourth Amendment, against Doe Officers 31–35;
(5) Unlawful arrest of Linda Mitchell, in violation of the Fourth Amendment, against Doe Officers 21–30;
(6) Unlawful search of Michael Mitchell's and Linda Mitchell's home and of Michael's vehicle, in violation of the Fourth Amendment, against Doe Officers 21–30
(7) Unlawful peacetime quartering of soldiers in Michael Mitchell's and Linda Mitchell's home, in violation of the Third Amendment, against Doe Officers 21–30;
(8)(a) Unlawful punishment of Anthony, in violation of the Eighth Amendment, against Does Officers 1–10, 32, and 55;
(8)(b) Unlawful punishment of Michael, in violation of the Eighth Amendment, against Doe Officers 21, 31–35;
(8)(c) Deliberate indifference to Anthony's medical needs, in violation of the Eighth Amendment, against Doe Officers 36 and 37;
(9) Malicious prosecution, in violation of the First, Fourth, and Fourteenth Amendments, against Reyes-Speer and Officers Walker, Worley, and Cawthorn; and
(10) Municipal liability under *Monell*, against the City of Henderson and the City of North Las Vegas;
(11) Conspiracy under 42 U.S.C. § 1985(3), against unspecified defendants; and
(12) Neglect to prevent conspiracy under 42 U.S.C. § 1986, against unspecified defendants.

The remaining ten claims are based on Nevada state law:

(13) Assault, against unspecified defendants;
(14) Battery, against unspecified defendants:

---

[66] Defendants 9–15 are collectively referred to as the "NLV Defendants."

(15) False arrest and imprisonment, against unspecified defendants;
(16) Intentional infliction of emotional distress, against unspecified defendants;
(17) Negligent infliction of emotional distress, by inference against Doe Officers
     1–10, Sergeant Waller, and Officers Albers, Cawthorn, Rockwell, and
     Snyder;
(18) Civil conspiracy, against unspecified defendants;
(19) Abuse of process, against unspecified defendants;
(20) Malicious prosecution, against unspecified defendants;
(21) Respondeat superior, against the City of Henderson and City of North Las
     Vegas; and
(22) Negligent hiring, retention, supervision, and training, against the City of
     Henderson and City of North Las Vegas.

The Henderson Defendants moved to dismiss all of the claims against them on various grounds. (Dkt. #17.)  As to the federal claims, they seek dismissal of the § 1983 claims against the individual defendants (Claims 1–9) as barred by the applicable two-year statute of limitations and for the improper use of "Doe" defendants.  They contend that all claims against Chief Chambers and Officer Walls should be dismissed for untimely service of process.  They further contend that all § 1983 claims against Chief Chambers should be dismissed because the Plaintiffs fail to allege her personal involvement in the alleged wrongdoing.  They assert that Chief Chambers and Officers Poiner, Feola, Walls, Walker, and Worley are entitled to qualified immunity.  As to all of the § 1983 claims, including the *Monell* claim (Claim 10) and except for the claim under the Eighth Amendment (Claim 8), the Henderson Defendants seek dismissal for failure to state a claim under Rule 12(b)(6).  The Henderson Defendants also assert the failure to state a claim under Rule 12(b)(6) for the claims based on § 1985(3) and § 1986.

As to the state law claims, the Henderson Defendants argue that the court lacks supplemental jurisdiction because the federal claims fail.  Next, they contend that the Plaintiffs failed to comply with the two-year statute of limitations for claims against political subdivisions, in violation of NRS § 41.036.  They also assert that Chief Chambers and Officers Poiner, Feola, Walls, Walker, and Worley are entitled to discretionary immunity under NRS § 41.032.  They further assert that Rule 12(b)(6) mandates dismissal of the claims for negligent infliction of emotional distress (Claim 17), abuse of process (Claim 19), and respondeat superior (Claim 21) for failure to state a claim.  Finally, the Henderson Defendants contend that punitive damages are not available as a matter of law, for both the state and federal claims.

The NLV Defendants filed a joinder to the Henderson Defendants' motion to dismiss.[67] (Dkt. #23.)  The NLV Defendants added only one new argument: that "[t]he individual North Las Vegas Defendants are entitled to qualified immunity."[68]  The Henderson Defendants raised qualified immunity only as to certain specified individuals, while the North Las Vegas Defendants appear to assert qualified immunity for all individual NLV Defendants whether named or unnamed.  In other words, the NLV Defendants seemingly want me to conclude that the Doe Defendants who correspond to NLVPD officers are entitled to qualified immunity even though their identities and their roles in the events are unknown.

For the reasons set forth below, the motion to dismiss and joinder are granted in part and denied in part.

## II.   ANALYSIS

### A.   Timeliness of Service of Process on Chief Chambers and Officer Walls

The Defendants move to dismiss under Rule 12(b)(5) for insufficient service of process. Under Rule 4(m), plaintiffs have "120 days after the complaint is filed" to serve process on the defendants.  If service is not timely, "the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time."[69]  However, "if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."[70]  Good cause generally exists where a plaintiff has shown diligent efforts to effect service, or other mitigating factors exist.[71]  Good cause also may be present when failure to

---

[67] (Dkt. No. 23.)

[68] (*Id.* at 4.)

[69] FED. R. CIV. P. 4(m).

[70] *Id.*

[71] 4B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1137 (3d ed. 2014).

1    serve in a timely manner is due to some third party's action.[72]  Absent good cause, district courts

2    have discretion to extend the time for service.[73]

3         The Complaint was filed on July 1, 2013, and the 120-day period expired on October 28,

4    2013.  Chambers and Walls were not served until October 31, 2013—three days late.  The

5    Plaintiffs argue that mitigating factors justify an extended time for service.  The HPD and

6    NLVPD accepted service for Chambers and Walls, then later reversed that acceptance.

7    Furthermore, Chambers and Walls either moved residences or were not available at their

8    residences until October 31.  In either event, the Plaintiffs' diligent efforts allow for a good cause

9    extension of the time for service under Rule 4.  Thus, Chambers and Walls were timely served.

10        **B.      <u>Doe Pleading</u>**

11        The Plaintiffs assert claims against multiple Doe individuals and Roe corporations,

12   describing them as "state police officers, sergeants, lieutenants, captains, commanders, deputy

13   chiefs, and/or civilian employee agents of HPD or NLVPD, or employees, agents, contractors

14   and/or representatives of Defendants City of Henderson or City of North Las Vegas and/or other

15   state political entities."[74]  Further, the Plaintiffs allege that "many records of these individuals are

16   protected by state statutes and can only be ascertained through the discovery process."[75]

17        Although Doe pleading is disfavored in federal court, when the identity of unknown

18   defendants "will not be known prior to the filing of a complaint . . . the plaintiff should be given

19   an opportunity through discovery to identify the unknown defendants, unless it is clear that

20   discovery would not uncover the identities[.]"[76]  The disfavor applies to pleadings that do not

21   allege enough facts to allow identification of the unknown defendants.

22

23

---

24   [72] *Id.*

25   [73] *Oyama v. Sheehan (In re Sheehan)*, 253 F.3d 507, 513 (9th Cir. 2001).

26   [74] (FAC ¶ 17.)

     [75] (*Id.*)

27   [76] *Gillespie*, 629 F.2d at 642.

28

Here, the Plaintiffs have pleaded with specificity the acts and roles of most of the unidentified officers, and will be able to determine the identities of those officers if granted discovery. Moreover, the defendant police departments know or should know the identities of the officers at issue. Therefore, I will not dismiss the first through ninth claims for relief simply because they include Doe defendants.

The Plaintiffs' descriptions of the Doe defendants are very broad, including a vast number of officers and state agencies. However, the following Doe defendants roles' are pleaded with sufficient particularity such that it is plausible that they are officers of the HPD or NLVPD:

(i)     Doe Officer 1 (NLVPD SWAT team, First Amendment retaliation claim)
(ii)    Doe Officer 2 (First Amendment retaliation claim)
(iii)   Doe Officers 1–10 (participation in the search of Anthony's home and the seizure of Anthony himself);
(iv)    Doe Officers 11–20 (entry into Linda and Michael's backyard)
(v)     Doe Officers 21–30 (participation in Linda's arrest, and in the search of Michael and Linda's home and truck);
(vi)    Doe Officers 21–22, 24 (participation in search of Anthony's truck);
(vii)   Doe Officers 31–35 (participation in Michael's arrest);
(viii)  Doe Officers 36–37 (participation in denial of Anthony's seizure medication in the Henderson Detention Center); and
(ix)    Doe Officers 32–55 (participation in Anthony's alleged "punishment" at the Henderson Detention Center).

All other Doe defendants are dismissed.

As to the Roe Corporations, the Plaintiffs have not explained the alleged role of these defendants such that later identification is reasonably possible. Therefore, the Roe Corporations are dismissed.

**C.      Fed. R. Civ. P. 12(b)(6) – Legal Standard**

A properly pleaded complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief."[77] While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."[78] "Factual allegations must be enough to rise above the

---

[77] FED. R. CIV. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[78] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

speculative level."[79]  To survive a motion to dismiss, a complaint must "contain[] enough facts to state a claim to relief that is plausible on its face."[80]

District courts must apply a two-step approach when considering motions to dismiss.[81] First, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences from the complaint in the plaintiff's favor.[82]  Legal conclusions, however, are not entitled to the same assumption of truth even if cast in the form of factual allegations.[83]  Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice.[84]

Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief.[85]  A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[86]  Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged—but it has not shown—that the pleader is entitled to relief."[87]  When the claims have not crossed the line from conceivable to plausible, the complaint must be dismissed.[88]  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the [district] court to draw on its judicial experience and common sense."[89]

---

[79] *Twombly*, 550 U.S. at 555.

[80] *Iqbal*, 556 U.S. at 696 (internal quotation marks and citation omitted).

[81] *Id.* at 679.

[82] *Id.*; *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247–48 (9th Cir. 2013).

[83] *Iqbal*, 556 U.S. at 679; *Brown*, 724 F.3d at 1248.

[84] *Iqbal*, 556 U.S. at 678.

[85] *Id.* at 679.

[86] *Id.* at 663.

[87] *Id.* at 679 (internal quotation marks and citation omitted).

[88] *Twombly*, 550 U.S. at 570.

[89] *Iqbal*, 556 U.S. at 679.

### D.   42 U.S.C. § 1983

#### 1.   Legal Standard

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 provides a mechanism for the private enforcement of substantive rights conferred by the U.S. Constitution and federal statutes.[90] Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"[91] "To state a claim under § 1983, a plaintiff must [1] allege the violation of a right secured by the Constitution and laws of the United States, and must [2] show that the alleged deprivation was committed by a person acting under color of state law."[92]

To be liable under 42 U.S.C. § 1983, a defendant must have personally participated in the alleged misconduct.[93] There is no *respondeat superior* liability under § 1983.[94] Thus, a supervisor cannot be liable merely because a subordinate engaged in illegal behavior. Rather, "[a] supervisor is liable under § 1983 for a subordinate's constitutional violations 'if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.'"[95]

---

[90] *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

[91] *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

[92] *West v. Atkins*, 487 U.S. 42, 48 (1988).

[93] *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

[94] *Id.*

[95] *Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (quoting *Taylor*, 880 F.2d at 1045).

In *Starr v. Baca*,[96] the Ninth Circuit "reaffirmed that a plaintiff may state a claim under § 1983 against a supervisor for deliberate indifference."[97]  To be held liable under a theory of deliberate indifference, "the supervisor need not be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury."[98] However, a § 1983 claim cannot be based on vicarious liability alone; rather, it must allege that the defendant's own conduct violated the plaintiff's civil rights.[99]

In § 1983 claims, "supervisors can be held liable for: (1) their own culpable action or inaction in the training, supervision, or control of subordinates; (2) their acquiescence in the complained-of constitutional deprivation; and (3) conduct that showed a reckless or callous indifference to the rights of others."[100]

### 2.    Official- and Individual-Capacity Claims

Defendants can be sued in their official and individual capacities.  State officials sued in their official capacity for damages are not persons for purposes of § 1983.[101]  However, state officials are suable in their official capacities for injunctive relief under § 1983.[102]  Official-capacity suits filed against government officials are merely an alternative way of pleading an action against the entity of which the defendant is an officer.[103]  As such, "[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an

---

[96] 652 F.3d 1202, 1205 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101 (2012).

[97] *Henry A. v. Willden*, 678 F.3d 991, 1003 (9th Cir. 2012).

[98] *Baca*, 652 F.3d at 1205 (quotation marks and citations omitted).

[99] *See City of Canton v. Harris*, 489 U.S. 378, 386 (1989).

[100] *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

[101] *Hafer v. Melo*, 502 U.S. 21, 27 (1991).

[102] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

[103] *See Hafer*, 502 U.S. at 25.

1   official capacity, the court may dismiss the officer as a redundant defendant."[104]  Government

2   officials may be sued in their personal capacity under § 1983 for money damages.[105]

3       Here, the Plaintiffs named as defendants the cities of Henderson and North Las Vegas as

4   well as the individuals in their official capacities.  Suing each individual in his or her official

5   capacity is redundant with the municipal liability claims.  Therefore, the official-capacity claims

6   against the individual defendants are dismissed.

### 3.      Statute of Limitations

8       The Defendants argue that the Plaintiffs' first through ninth claims for relief—the § 1983

9   claims against individual officers—are barred by the statute of limitations.[106]  The timeliness of

10   § 1983 claims is governed by the forum state's personal-injury statute of limitations.[107]  The

11   Nevada statute of limitations for personal injury claims is two years.[108]  Because the events from

12   which the present case arises took place on July 10, 2011, and the FAC was filed on October 14,

13   2013, the Defendants argue that the individual § 1983 claims are untimely and should be

14   dismissed with prejudice.

15       However, the Plaintiffs rightfully argue that the original Complaint was filed within the

16   two-year period on July 1, 2013.  Rule 15(c)(1)(B) provides that "[a]n amendment to a pleading

17   relates back to the date of the original pleading when . . . the amendment asserts a claim or

18   defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set

19   out—in the original pleading."[109]  Amended claims brought outside the limitations period are

---

[104] *Center for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).

[105] *See Hafer*, 502 U.S. at 31.

[106] *See Chudacoff v. Univ. Med. Ctr.*, 954 F. Supp. 2d 1065, 1073 (D. Nev. 2013) ("Section 1983 claims are governed by the forum state's statute of limitations for personal injury actions." (citing *Knox v. Davis*, 260 F.3d 1009, 1012–13 (9th Cir. 2001))).

[107] *Rosales-Martinez v. Palmer*, 753 F.3d 890, 895 (9th Cir. 2014).

[108] N.R.S. § 11.190(4).

[109] FED. R. CIV. P. 15(c)(1)(B).

1  precluded from dismissal if they relate back to the same "common core of operative facts."[110]

2  Thus, any claims in the FAC that arise out of the common core of operative facts on which the

3  Complaint relied relate back.  As all facts and claims pleaded in the FAC arise out of the events

4  which took place on July 10, 2011, the new claims in the FAC relate back under Rule 15.

5       As to the new parties added in the FAC—NLVPD Officers Waller, Albers, Cawthorn,

6  Rockwell, and Snyder—Rule 15(c)(1)(C) provides that an amendment that "changes the party or

7  the naming of the party against whom a claim is asserted" relates back if the amendment arises

8  from the same "conduct, transaction, or occurrence set out" in the original pleading and the newly

9  named party "(i) received such notice of the action that it will not be prejudiced in defending on

10  the merits; and (ii) should have known that the action would have been brought against it, but for

11  a mistake concerning the proper party's identity."  As explained above, the amendments arise

12  from the same transaction or occurrence as the original pleading.  And the newly-named officers

13  cannot reasonably assert that they are surprised to be named in an amended pleading.  They are

14  certainly aware of their own involvement in the incidents in question, and the City of North Las

15  Vegas and NLVPD Chief Chronister were named in the Complaint.  In addition, the Plaintiffs

16  have seemingly had a fair amount of difficulty determining the names and identities of the

17  officers involved in the events of July 10, 2011 because the defendant police departments either

18  refuse to provide the officers' names or are prohibited from doing so by Nevada statute, absent

19  court-ordered discovery.  The amendments adding these new parties relate back under Rule 15.

20       The Defendants' statute of limitations argument thus fails.

21          **4.  Lack of Personal Participation by HPD Chief Chambers and NLVPD**

22          **Chief Chronister**

23       The Defendants are correct that the FAC's allegations are insufficient to maintain a claim

24  against Chambers based on her role as a supervisor.  Despite mentioning Chambers in two

25  paragraphs, the Plaintiffs have not alleged any definitive claim against her or that she directed or

26

27 ───────────────

28       [110] *Williams v. Boeing Co*., 517 F.3d 1120, 1133 (9th Cir. 2008).

ratified the alleged constitutional violations.[111]  The § 1983 claims against Chambers are therefore dismissed.  Moreover, there are no allegations tying Chambers to the state law claims.  Thus, the state law claims against her are also dismissed.

The same is true for Chronister.  Because the Plaintiffs do not allege his personal involvement in the alleged constitutional violations or the alleged state law violations, all claims against him are dismissed.

### 5.    Lack of Personal Participation by HPD Officers Poiner, Feola, and Walls

The Plaintiffs have not alleged any wrongdoing by HPD Officers Poiner, Feola, and Walls.  Indeed, these three officers are named only in the caption and in the paragraph listing the various HPD police officer defendants.[112]  Some of the claims—federal and state—are alleged against all the Defendants or against unspecified defendants.  Regardless, there are no specific allegations as to these three officers.  Thus, all claims against Officers Poiner, Feola, and Walls are dismissed.

### 6.    Qualified Immunity

The Defendants assert qualified immunity as an affirmative defense.  "The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'"[113]  District courts "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."[114]  To satisfy the first prong, the "'the complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'"[115]  In other words,

---

[111] *See Maxwell*, 708 F.3d at 1086.

[112] (FAC ¶ 12.)

[113] *Wood v. Moss*, 134 S. Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)).

[114] *al-Kidd*, 131 S. Ct. at 2080.

[115] *Wood*, 134 S. Ct. at 2067 (quoting *Iqbal*, 556 U.S. at 678).

1    the first prong incorporates the *Iqbal/Twombly* "plausibility" analysis applied to motions to

2    dismiss under Rule 12(b)(6).

3           As to the second prong, "[r]equiring the alleged violation of law to be 'clearly established'

4    'balances . . . the need to hold public officials accountable when they exercise power

5    irresponsibly and the need to shield officials from harassment, distraction, and liability when they

6    perform their duties reasonably.'"[116]  "The 'dispositive inquiry,'" the Supreme Court has held,

7    "'is whether it would [have been] clear to a reasonable officer'" in that officer's position "'that

8    [her] conduct was unlawful in the situation [she] confronted.'"[117]

9           The Supreme Court does "not require a case directly on point" to put an officer on notice

10   of what behavior violates the Constitution, "but existing precedent must have placed the statutory

11   or constitutional question beyond debate."[118]

12          A right can be clearly established despite a lack of factually analogous preexisting
        case law, and officers can be on notice that their conduct is unlawful even in novel
13      factual circumstances. . . . We must assess the legal rule in light of the specific
        context of the case, not as a broad general proposition.[119]
14

15   The qualified immunity analysis is fact-specific and requires an individualized analysis of each

16   defendant's alleged actions in relation to the "situation [she] confronted."[120]  In the absence of

17   genuine issues of material fact, qualified immunity is a "question[] of law to be determined by the

18   court."[121]

19          Taking the allegations as true, the situation confronted by the officers is as follows.   A

20   woman called 911 to report an incident of domestic violence.  Officers from the HPD and

21

22   _____

23      [116] *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

        [117] *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

24      [118] *al-Kidd*, 131 S. Ct. at 2083 (internal quotation marks and citation omitted).

25      [119] *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013) (internal quotation marks and
        citation omitted).

26      [120] *Wood*, 131 S. Ct. at 2067; *see also Tamas v. Dep't of Social & Health Servs.*, 630 F.3d 833,
27   847 (9th Cir. 2010); *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

        [121] *Id.*
28

NLVPD arrived on scene to find the suspect (Mr. White) refusing to exit his home because he did not want to leave his one-month-old infant alone.  The officers apparently had a clear view of White, who was sitting on a couch visible through the open front door.  White maintained telephonic communication with Michael Mitchell for an unknown duration.  From inside their homes, various neighbors, including the Plaintiffs, were photographing and videotaping the armed officers as they moved up and down the street and around the suspect's home.  Anthony Mitchell put on a bulletproof vest.  The officers could not know what communication was occurring between White and his neighbors.  Importantly, there are no allegations—direct or indirect—that the neighbors posed a threat to the officers or that the photography/video interfered with the officers' work.

I next analyze whether the officers are entitled to qualified immunity for each of the specific claims.

### a.        First Amendment Retaliation (Claim 1)

The Plaintiffs have sufficiently pleaded a retaliation claim.  The legal standard for First Amendment retaliation requires the plaintiff to demonstrate that:

(1) he engaged in constitutionally protected activity;

(2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and

(3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.[122]

The Plaintiffs were engaged in protected speech activities.  The Plaintiffs cite three constitutionally protected activities as bases for this claim: (i) Michael's allegation that he "yelled for the officers outside to shut the siren off"; (ii) Michael, Linda, and Anthony Mitchell's allegations that they were taking photographs of police conduct from inside their homes; and (iii) Anthony's allegation that he gave an officer the middle finger to express his disapproval for the officer's conduct.  Individuals are entitled to verbally oppose police activities, which includes

---

[122] *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).

1    obscene gestures such as giving the middle finger.[123]  And individuals have a "First Amendment

2    right to film matters of public interest," which includes police officers performing their duties.[124]

3    The Defendants do not dispute that their alleged conduct in pointing firearms at the Plaintiffs and

4    entering their homes without a warrant would chill a person of ordinary firmness from ceasing to

5    engage in protected activity.

6         As to causation, the factual allegations support a reasonable inference that the officers'

7    chilling actions were in response to the Plaintiffs' protected activity.  The close connection in

8    time between photographing police activity and the police actions of pointing firearms at the

9    Plaintiffs renders a retaliatory intent plausible.  Furthermore, the allegation that an unidentified

10   officer mentioned the middle-finger gesture to Anthony immediately after Anthony was forcibly

11   removed from his home suggests a retaliatory intent to chill the protected activity of opposing

12   police conduct.

13        Based on the facts as pleaded and the state of the law, it would be clear to any reasonable

14   police officer who confronted the situation that morning that it would be unconstitutional to point

15   loaded weapons at seemingly unarmed persons who were videotaping the police officers'

16   conduct.[125]  Likewise, it would be clear to any reasonable officer that forcibly entering the home

17   of a person and removing that person from the premises in response to that person giving the

18   middle-finger gesture to the police violates the Constitution.[126]  It has long been clearly

19   established that:

20        the First Amendment protects a significant amount of verbal criticism and
        challenge directed at police officers. Speech is often provocative and challenging.
21        . . . [But it] is nevertheless protected against censorship or punishment, unless
        shown likely to produce a clear and present danger of a serious substantive evil
22        that rises far above public inconvenience, annoyance, or unrest. . . . The freedom
        of individuals verbally to oppose or challenge police action without thereby risking
23

24   _____

     [123] *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461–63 (1987); *Duran v. City of Douglas, Ariz.*,
25   904 F.2d 1372 (9th Cir. 1990).

26        [124] *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

     [125] *See Fordyce*, 55 F.3d at 439.
27
     [126] *See Skoog*, 469 F.3d at 1232; *Duran*, 904 F.2d at 1378.
28

1

arrest is one of the principal characteristics by which we distinguish a free nation from a police state.[127]

2

3

Although *Hill* does not speak of photographing the police or giving the middle-finger gesture, the

4

salient point is that there is no indication that the Plaintiffs' activities placed the officers in

5

danger.  Moreover, *Duran* clearly established that aiming obscene gestures at the police is

6

protected speech, and *Fordyce* clearly established that persons have a First Amendment right to

7

film matters of public interest like police activities.[128]

8

If facts later emerge that paint a different picture of what the police officers confronted

9

that day, the Defendants may be able to assert the defense of qualified immunity on a motion for

10

summary judgment.

11

**b.      Fourth Amendment Claims Against Individual NLVPD Officers (Claim 2)**

12

The individual NLVPD Officers are not entitled to qualified immunity for these claims.

13

The Plaintiffs have sufficiently pleaded that these defendants violated the Plaintiffs' constitutional

14

rights under the Fourth Amendment by entering their homes and searching their homes and

15

property without consent or a warrant, by forcibly removing Linda from her home, and by

16

arresting Anthony without a warrant.[129]

17

It is clearly established that the Fourth Amendment prohibits warrantless searches, unless

18

one of two general exceptions exists: emergency or exigency.[130]

19

20

The "emergency" exception stems from the police officers' community caretaking function and allows them to respond to emergency situations that threaten life or limb. . . .  By contrast, the "exigency" exception . . . derive[s] from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to prevent . . . the

21

22

23

24

25

[127] *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461–63 (1987) (internal quotation marks and citation omitted).

26

[128] *Fordyce*, 55 F.3d at 439; *Duran*, 904 F.2d at 1378.

27

[129] *See* Section II.D.7, *infra*.

[130] *See Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009).

28

1    destruction of relevant evidence, the escape of the suspect, or some other
     consequence improperly frustrating legitimate law enforcement efforts.[131]

2

3    Likewise, it is clearly established that warrantless arrests absent probable cause and exigent

4    circumstances violate the Fourth Amendment.[132]  As aptly put by the Ninth Circuit in *Duran*:

5        if there is one irreducible minimum in our Fourth Amendment jurisprudence, it is
         that a police officer may not detain an individual simply on the basis of suspicion

6        in the air.  No matter how peculiar, abrasive, unruly or distasteful a person's
         conduct may be, it cannot justify a police stop unless it suggests that some specific

7        crime has been, or is about to be, committed, or that there is an imminent danger to
         persons or property.[133]

8

9    The Ninth Circuit's recent opinion in *Sandoval v. Las Vegas Metropolitan Police

10   Department*[134] is instructive.[135]  There, the court declined to extend qualified immunity to officers

11   where, "[i]n the course of the afternoon, police pointed guns at the [plaintiffs], entered the home

12   without a warrant, handcuffed and detained the [plaintiffs] and others, and shot and killed the

13   family dog."[136]  The court held that the indicia of exigent circumstances that could have justified

14   warrantless entry were not present, so qualified immunity was denied.[137]

15       The facts of *Sandoval* are quite similar to the facts of the present case.  Here, the Plaintiffs

16   allege that the police, without a warrant, entered and searched the home and vehicle of Anthony

17   Mitchell, and entered and searched the home of Michael and Linda Mitchell.  The Plaintiffs were

18   not attempting to destroy evidence, flee from capture, or escape from custody.  The only possible

19   _____

20       [131] *Id.* (internal quotation marks and citation omitted).

21       [132] *Blankenhorn v. City of Orange*, 485 F.3d 463, 476 (9th Cir. 2007); *U.S. v. Struckman*, 603 F.3d
     731, 739 (9th Cir. 2010)

22       [133] *Duran*, 904 F.2d at 1378.

23       [134] *Sandoval v. Las Vegas Metropolitan Police Dept.*, 756 F.3d 1154 (9th Cir. 2014).

24       [135] Although the *Sandoval* opinion post-dates the events at issue in this case by about three years,
     the case is nonetheless instructive because it relied upon pre-2011 case law to conclude that questions of

25   fact surrounding the emergency aid exception to the warrant requirement precluded a determination of
     qualified immunity, and that "it is clearly established Federal law that the warrantless search of a dwelling

26   must be supported by probable cause and the existence of exigent circumstances." *Id.* at 1163 (internal
     quotation marks and citation omitted).

27       [136] *Id.* at 1158.

     [137] *Id.* at 1165.

28

1    exigent circumstance would be the need to prevent physical harm to the police officers or to

2    others.  On the basis of the Plaintiffs' allegations, at no point did the Plaintiffs' actions endanger

3    any police officer or other person.

4         Based on the facts as alleged at present, the defense of qualified immunity is denied with

5    regard to NLVPD Officers Waller, Albers, Cawthorn, Rockwell and Snyder for the Second Claim

6    for Relief.  To the extent Doe Officers 1–10 are alleged to have engaged in the same conduct as

7    these five NLVPD officers, qualified immunity would be denied as to these Does as well.

8    However, once these Does are identified, they may raise qualified immunity in their own stead if

9    facts exist to justify that defense.

10            **c.     Use of Force Against Anthony (Claim 3)**

11        The Defendants raise qualified immunity as a defense against Anthony's claim of

12   excessive force under the Fourth Amendment.  The Plaintiffs sufficiently plead that various

13   officers used excessive force by pointing loaded firearms at Anthony, firing pepperball rounds at

14   him, handcuffing him roughly, dragging him from his home, and slamming his face into and

15   holding it against the stucco exterior of his home for several minutes.[138]  In *Robinson v. Solano*

16   *County*, the Ninth Circuit held that police officers who drew and pointed a gun at the head of an

17   apparently unarmed misdemeanor suspect were not entitled to qualified immunity.[139]  In *Frunz v.*

18   *City of Tacoma*, the court determined that "[b]ursting through the back door unannounced with

19   guns drawn and handcuffing the occupants—the owner for a full hour—was neither necessary nor

20   reasonable. . . [as n]o reasonable officer familiar with the law of searches and seizures could have

21   thought otherwise."[140]

22        The series of actions that Plaintiffs allege the officers committed far exceeds the rough

23   handcuffing that the Ninth Circuit found excessive in *Robinson* and *Frunz.*  It appears that the

24   officers violated clearly-established rights.  Therefore, the defense of qualified immunity is

---

[138] (FAC ¶ 129.)

[139] *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002).

[140] *Frunz v. City of Tacoma*, 468 F.3d 1141, 1146 (9th Cir. 2006).

1     denied for defendants Sergeant Michael Waller, Officer Albers, Officer David Cawthorn, Officer

2     Rockwell, and Officer Snyder for the Third Claim for Relief.

### d.     Malicious Prosecution (Claim 9)

4        This claim is pleaded against HPD Officers Walker and Worley, Henderson Attorney

5     Reyes-Speer, NLVPD Officer Cawthorn, and Doe Officers 38–45.

### i.     The Investigating Officers

7        As against the police officers, the Plaintiffs fail to sufficiently plead the violation of a

8     constitutional right in relation to this claim.  The Plaintiffs conclusorily allege that HPD Officers

9     Walker and Worley and NLVPD Officer Cawthorn  (1) filed police reports with knowingly false

10     statements, with the intent to be used to maliciously prosecute Anthony and Michael;[141]

11     (2) "caused Anthony . . . and Michael . . . to be jailed and caused criminal complaints to issue

12     against them in order to violate their constitutional rights, to provide cover for Defendants'

13     wrongful actions, to frustrate and impede Plaintiffs' ability to seek relief for those actions, and to

14     further intimidate and retaliate against Plaintiffs";[142] and (3) caused criminal complaints to issue

15     against Anthony and Michael while knowing there was no probable cause to initiate the criminal

16     proceedings against them.[143]  Missing entirely is detail about what was false about the police

17     reports and what other intentional, wrongful conduct, if any, *caused* Anthony and Michael to be

18     jailed and face criminal charges.  Accordingly, the proper approach is to dismiss this claim

19     without prejudice as against the police officers.  Thus, I need not reach the other prong of

20     qualified immunity—whether the rights allegedly violated were clearly established.

21        I will briefly address, however, the Henderson Defendants' confusion between damages

22     immunity and qualified immunity.  The Henderson Defendants assert, under *Newman v. County*

23     *of Orange*,[144] that officers Walker and Worley are entitled to qualified immunity based on Reyes-

24

---

25       [141] (FAC ¶¶ 89–91.)

26       [142] (FAC ¶ 96.)

27       [143] (FAC ¶ 172.)

      [144] 457 F.3d 991, 993 (9th Cir. 2006).

28

Speer's subsequent filing of the criminal complaint.  In *Newman*, the Ninth Circuit articulated a rule for damages immunity, not qualified immunity.  "We have long recognized that filing a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused arrest exists at that time."[145]  This rule has nothing to do with qualified immunity for acts prior to the filing of charges.  And whether Reyes-Speer's judgment in filing the criminal complaint was sufficiently independent to limit these officers' liability for damages is a moot issue because this claim is insufficiently pleaded against the officers.

### ii.      Assistant City Attorney Reyes-Speer (Absolute Immunity)

The Plaintiffs allege that Reyes-Speer "acted willfully, knowingly, and with malice and specific intent to deprive Anthony . . . and Michael . . . of their constitutional rights to freedom from illegal searches, unlawful arrest, detention, and their rights to freedom of expression, to physical liberty, and to due process of law under the First, Fourth, Fifth and Fourteenth Amendments . . . by filing criminal complaints as complainant under penalty of perjury[.]"[146] The NLVPD Defendants argue that this claim should be dismissed because Reyes-Speer enjoys absolute immunity when acting within the scope of her prosecutorial duties.

The Supreme Court has held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."[147]  In *McCarthy v. Mayo*, the Ninth Circuit held that absolute immunity attaches when the prosecutor takes quasi-judicial actions within the scope of her authority.[148]  There, the court looked to the nature or

---

[145] *Id.* (internal quotation marks and citation omitted).

[146] (FAC ¶ 173.)

[147] *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976).

[148] 827 F.2d 1310, 1314 (9th Cir. 2004).

1   function of the "ultimate act" in determining whether the act was quasi-judicial within the

2   prosecutor's authority.[149]

3       The Plaintiffs contend that Reyes-Speer is not entitled to absolute immunity because she

4   acted outside her authority as a prosecutor by performing administrative or investigative

5   functions.  Specifically, they contend she acted as a complaining witness by testifying under

6   penalty of perjury as to the truth of the assertions in the criminal complaint.  Under *Kalina v.*

7   *Fletcher*, the Plaintiffs argue, prosecutorial immunity does not accrue when the prosecutor acts as

8   the complaining witness.[150]

9       Reyes-Speer's actions were within the scope of her role as a prosecutor.  Signing the

10  complaint was simply an act in furtherance of her role of bringing a complaint as a prosecutor,

11  and she is entitled to absolute immunity under § 1983 for that act.  Signing a complaint under

12  penalty of perjury does not necessarily convert the signer into a complaining witness.[151]  In

13  *Kalina*, the prosecutor did not enjoy absolute immunity because he presented the judge with a

14  complaint and a supporting affidavit, which contained inaccurate information, to establish

15  probable cause for an arrest.[152]  Here, Reyes-Speer did not attest to the truth of the underlying

16  factual allegations by filing a supporting affidavit.  Her acts of preparing, signing and filing the

17  criminal complaint were prosecutorial in nature—advocacy on behalf of the government.[153]

18      The Ninth Claim for Relief is dismissed without prejudice as to the police officers, and

19  dismissed with prejudice as to Reyes-Speer.

20          **7.      First Claim for Relief — Retaliation for Protected Speech**

21      As set forth above, the Plaintiffs have sufficiently pleaded this claim.

22

23

24      [149] *Id.*

25      [150] 522 U.S. 118, 127 (1997).

26      [151] *See Mishler v. Clift*, 191 F.3d 998, 1009 (9th Cir. 1999).

27      [152] *Kalina*, 522 U.S. at 505.

28      [153] *See Schenck v. Chavis*, 461 F.3d 1043, 1046 (8th Cir. 2006).

### 8.   Second, Third, Fourth, Fifth, and Sixth Claims for Relief — Fourth Amendment

The Second, Third, Fourth, Fifth, and Sixth Claims for Relief allege that Officers Waller, Albers, Cawthorn, Rockwell, Snyder, and Doe Officers 1–35 seized and arrested Plaintiffs in their homes, entered into and searched the homes without a warrant, permission, probable cause, or other legal justification; and used excessive force against Anthony Mitchell.  The Henderson Defendants argue that because the various Fourth Amendment claims for relief (Claims 2–6) list only named NLVPD officers and Doe Officers 1–35, the Plaintiffs have failed to state a claim against any Henderson Defendant.[154]

I decline to dismiss these claims on that basis.  The Plaintiffs have sufficiently pleaded the Doe Officers' roles and behavior; all that is missing is their names.  In context, it is plausible that the Doe Defendant could be members of the HPD or the NLVPD.  Without discovery to determine the identities of these Doe defendants, dismissal would be premature.[155]

### 9.   Seventh Claim for Relief — Third Amendment

The Third Amendment states: "[n]o Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."  The Plaintiffs claim that, within the scope of the Third Amendment, police officers should be considered soldiers and that police officers' occupancy of a house for less than twenty-four hours constitutes quartering.  The Plaintiffs do not propose a minimum time period below which quartering does not occur, but they assert that the approximately nine hours of police occupancy in this case amounts to quartering.

Third Amendment case law is sparse.  *Englbom v. Carey* examined whether quartering state National Guardsmen in prison staff housing during a staff labor strike violated the Third Amendment.  The Second Circuit held that (i) National Guardsmen are soldiers for purposes of the Third Amendment; (ii) "the Third Amendment is incorporated into the Fourteenth Amendment for application to the states"; and (iii) "property-based privacy interests protected by

---

[154] (Dkt. No. 17 at 34 (Def.'s Mot. Dismiss at 27).)

[155] *See Gillespie*, 629 F.2d at 642–43.

the Third Amendment are not limited solely to those arising out of fee simple ownership but extend to those recognized and permitted by society as founded on lawful occupation or possession with a legal right to exclude others."[156]  The court determined that the prison staff had a sufficient property interest in their on-site housing to exclude others, and thus the district court's summary dismissal of their Third Amendment claim was erroneous.

On remand, the district court held that the officers were entitled to qualified immunity on the Third Amendment claim because the plaintiffs' Third Amendment rights were not clearly established at the time of the alleged violation.[157]  The Second Circuit affirmed the qualified immunity determination.[158]

In *Estate of Bennett v. Wainwright*, the court held that municipal police officers are not soldiers under the Third Amendment and that the use of a house for less than twenty-four hours does not constitute quartering.[159]  The court stated that "[t]he plaintiff's position appears to be another of the 'far-fetched, metaphorical applications' of this amendment that have been 'summarily rejected' as noted by the Second Circuit."[160]  This holding is supported by the original purposes of the Third Amendment.

The Third Amendment was passed in response to several quartering acts imposed on the American colonists by Parliament; these acts functioned as a pseudo-tax to support the British military.[161]  Modern interpretations of the Third Amendment, under the penumbra of *Griswold v. Connecticut*, have described the amendment as protecting a fundamental right to privacy.[162]  In *Engblom*, the Second Circuit incorporated the Third Amendment into the Fourteenth Amendment

---

[156] 677 F.2d 957, 962–63 (2d Cir. 1982).

[157] 572 F. Supp. 44, 49 (S.D.N.Y. 1983).

[158] 724 F.2d 28, 28 (2d Cir. 1983) (per curiam).

[159] *Estate of Bennett v. Wainwright*, No. 06-28-P-S, 2007 WL 1576744 (D. Me. May 30, 2007).

[160] *Id.* at *7.

[161] William Sutton Fields, *The Third Amendment: Constitutional Protection from the Involuntary Quartering of Soldiers*, 124 MIL. L. REV. 195, 200 (1989).

[162] *Id.* at 204 n.81.

based on the logic that the "property-based privacy interests protected by the Third Amendment were not limited solely to those arising out of fee simple ownership but extended to those recognized and permitted by society as founded on lawful occupation with a legal right to exclude others."[163]  Thus, under *Griswold*, the Third Amendment protects private citizens from incursion by the military into their property interests, and guarantees the military's subordinate role to civil authority.[164]

In the present case, various officers of the HPD and NLVPD entered into and occupied Linda's and Michael's home for an unspecified amount of time (seemingly nine hours), but certainly for less than twenty-four hours.  The relevant questions are thus whether municipal police should be considered soldiers, and whether the time they spent in the house could be considered quartering.  To both questions, the answer must be no.

I hold that a municipal police officer is not a soldier for purposes of the Third Amendment.  This squares with the purpose of the Third Amendment because this was not a military intrusion into a private home, and thus the intrusion is more effectively protected by the Fourth Amendment.  Because I hold that municipal officers are not soldiers for the purposes of this question, I need not reach the question of whether the occupation at issue in this case constitutes quartering, though I suspect it would not.  Furthermore, I need not address whether the Third Amendment rights allegedly violated were clearly established as of June 2011.

The Seventh Claim for Relief is dismissed with prejudice for failure to state a claim under Rule 12(b)(6).

### 10.    Tenth Claim for Relief — *Monell* Liability

In *Monell*, the Supreme Court held that local government units are "persons" for the purposes of Section 1983.[165]  A plaintiff may establish *Monell* liability by showing that:

---

[163] *Engblom*, 677 F.2d at 962.

[164] Thomas L. Avery, *The Third Amendment: The Critical Protections of a Forgotten Amendment*, 53 WASHBURN L.J. 179, 192 (2014).

[165] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).

(1) conduct pursuant to an official policy inflicted the injury; (2) the constitutional tort was the result of a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (3) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (4) an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate.[166]

"Generally, a municipality is liable under *Monell* only if a municipal policy or custom was the 'moving force' behind the constitutional violation. . . . In other words, there must be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d, 950, 957 (9th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

Inadequate supervision can form the basis of *Monell* liability if the training or supervision "is sufficiently inadequate as to constitute deliberate indifference as to the rights of persons with whom the police come into contact."[167]  Failure to discipline is a form of inadequate supervision, and a single instance can support *Monell* liability if the failure amounts to ratification of the wrongdoers' conduct.[168]  "To show ratification, a plaintiff must prove that the authorized policymakers approve a subordinate's decision and the basis for it."[169]  Otherwise, a single failure to discipline is insufficient for liability.  However, the allegation of a single instance of failure to discipline may be sufficient to survive a motion to dismiss under Rule 12(b)(6).[170]

The allegation that none of the involved officers was disciplined for their involvement in the alleged constitutional violations renders it plausible that the cities of Henderson and North Las Vegas have a custom of failing to discipline officers which amounts to deliberate indifference for the rights of the residents of Henderson and North Las Vegas.  The *Monell* claim survives on this basis.

---

[166] *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (internal quotation marks and citation omitted).

[167] *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).

[168] *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014).

[169] *Id.* (internal quotation marks and citation omitted).

[170] *See Howard v. City of Vallejo*, No. CIV S-13-1439 at *3–4 (E.D. Cal. Nov. 13, 2013).

1

### E.      42 U.S.C. § 1985(3) — Conspiracy

2    A cause of action for conspiracy under § 1985(3) has four elements:

3    (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

4    person or class of persons of the equal protection of the laws, or of equal privileges
     and immunities under the laws; and (3) an act in furtherance of this conspiracy;
     (4) whereby a person is either injured in his person or property or deprived of any

5    right or privilege of a citizen of the United States.[171]

6    "Further, the second of these four elements requires that in addition to identifying a legally

7    protected right, a plaintiff must demonstrate a deprivation of that right motivated by 'some racial,

8    or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators'

9    action.'"[172]  Put another way, plaintiffs under § 1985(3) must "show that they are members of a

10   class that the government has determined 'require[s] and warrant[s] special federal assistance in

11   protecting their rights.'"[173]  The rights protected by § 1985(3) are "the right to be free from racial

12   discrimination, the right of interstate travel, and the right to equal protection of the laws."[174]

13   "*Griffin* . . . create[d] a cause of action for any tortious interference with a legally-protected right

14   if motivated by the requisite class-based animus[.]"[175]

15         The Plaintiffs have failed to allege membership in any cognizable, let alone protected,

16   class.  They argue membership in a "class" comprising those who are victims of a police policy of

17   punishing persons for exercising their First Amendment rights.[176]  This circular argument is

18   unavailing, as there is no indication of class-based animus in the Plaintiffs' allegations.

19   Moreover, the Ninth Circuit has held that "we require either that the courts have designated the

20   class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or that

21

22   _____

     [171] *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 828–29 (1983).

23   [172] *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

24   [173] *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1056 (9th Cir. 2002) (quoting *Sever*, 978 F.2d at 1536).

25
     [174] *Life Ins. Co. of N. Am. v. Reichardt*, 591 F.2d 499, 503 (9th Cir. 1979) (citing *Griffin*, 403 U.S.

26   at 102–03).

27   [175] *Id.*

     [176] (Dkt. No. 31 at 42.)
28

Congress has indicated through the legislation that the class required special protection."[177]  The Plaintiffs have not pleaded membership in any such class.  The Eleventh Claim for Relief is therefore dismissed.

### F.     42 U.S.C. § 1986 — Neglect to Prevent Conspiracy

Because no valid claim exists under § 1985(3), no valid claim can exist under § 1986.[178] The Twelfth Claim for Relief is therefore dismissed.

### G.     State Law Claims

#### 1.     Failure to Timely Present the Claims as Required by Nevada Law

The Defendants assert that the Plaintiffs have not complied with NRS § 41.036(2), which effectively creates a two-year statute of limitations for tort claims against political subdivisions of the state.  The Plaintiffs respond that the statute does not apply because the HPD and NLVPD are not political subdivisions.  But the HPD and NLVPD are not defendants in this case.  The Plaintiffs are suing the cities of Henderson and North Las Vegas, both of which are political subdivisions of the State of Nevada.[179]  Nevertheless, the Plaintiffs have substantially complied with NRS § 41.036(2) because the FAC relates back to the original Complaint, as discussed above in relation to Rule 15.  Thus, the state law claims are not dismissed for lack of compliance with NRS 41.036(2).

#### 2.     Discretionary Immunity

Although Nevada has generally waived its sovereign immunity under NRS § 41.031,[180] the State has retained immunity under NRS § 41.032 for officials exercising discretion.  No actions may be brought against an officer or employee of the State or any of its agencies or

---

[177] *Sever*, 978 F.2d at 1536.

[178] *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1040 (9th Cir. 1990).

[179] *See City of Boulder v. State*, 793 P.2d 845 (Nev. 1990) (case caption refers to each of these cities as "a political subdivision of the State of Nevada").

[180] Notably, this statutory waiver of immunity does not authorize suits against the State of Nevada in federal court because the State has retained its Eleventh Amendment immunity. *Carey v. Nev. Gaming Control Bd.*, 279 F.3d 873, 877 (9th Cir. 2002).

political subdivisions that is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty."[181]

      The Nevada Supreme Court has adopted the *Berkovitz-Gaubert* test to determine whether conduct was "discretionary": the decision at issue "must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy."[182] The United States Supreme Court developed the *Berkovitz-Gaubert* test to assess the Federal Tort Claims Act's discretionary-function exception.[183]  Not surprisingly, the Nevada Supreme Court looks to caselaw under the FTCA and to the jurisprudence of other states that have adopted the *Berkovitz-Gaubert* test.[184]  "Decisions at all levels of government, including frequent or routine decisions, may be protected by discretionary immunity, if the decisions require analysis of government policy concerns."[185]  "[I]f the injury-producing conduct is an integral part of governmental policy-making or planning, if the imposition of liability might jeopardize the quality of the governmental process, or if the legislative or executive branch's power or responsibility would be usurped, immunity will likely attach under the second criterion."[186]

      The Defendants have not articulated how the individual officers' decisions were "based on considerations of social, economic, or political policy."[187]  For purposes of this Order, I am convinced that the officers' conduct involved elements of individual judgment or choice.  But without more, I am not prepared to hold that police officers' decisions about how to respond to a domestic violence call—or how to treat citizens who are watching, filming or showing the middle

---

[181] NRS § 41.032(2).

[182] *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007) (citing *U.S. v. Gaubert*, 499 U.S. 315 (1991); *Berkovitz v. U.S.*, 486 U.S. 531 (1988)).

[183] *Gaubert*, 499 U.S. at 318.

[184] *See Ransdell v. Clark Cnty.*, 192 P.3d 756 (Nev. 2008); *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1066–67 (Nev. 2007).

[185] *Martinez*, 168 P.3d at 729.

[186] *Id.*

[187] *Id.*

finger to officers—are an integral part of governmental policy-making or planning.[188]  Moreover, holding police officers liable under state law for the conduct alleged in this case does not seem likely to usurp the executive branch's power or responsibility.  Therefore, the individual officers are not entitled to discretionary immunity.

### 3.    Negligent Infliction of Emotional Distress

Under Nevada law, "[a] bystander who witnesses an accident may recover for emotional distress in certain limited situations."[189]  To prevail, "the witness-plaintiff must prove that he or she (1) was located near the scene; (2) was emotionally injured by the contemporaneous sensory observance of the accident; and (3) was closely related to the victim."[190]

As to Linda's telephonic perception of the traumatic events, several courts have held that blind plaintiffs may bring an NIED claim for having heard an accident or for having been told about an accident.[191]  However, the Plaintiffs have pleaded only that Linda suffered "shock," which does not satisfy the requirement to show a physical manifestation of emotional harm.[192]  Accordingly, this claim is dismissed without prejudice. If Plaintiffs can allege sufficient facts to satisfy the elements of an NIED claim, they may re-plead this claim.

### 4.    Abuse of Process

"[T]he elements of an abuse of process claim are: (1) an ulterior purpose by the defendants other than resolving a legal dispute, and (2) a willful act in the use of the legal process not proper in the regular conduct of the proceeding."[193]  The Defendants argue that Plaintiffs have failed to state a claim because the mere filing of a criminal complaint does not establish abuse of

---

[188] *See id.*

[189] *Grotts v. Zahner*, 989 P.2d 415, 416 (Nev. 1999).

[190] *Id.*

[191] *Laskas v. Zimmerman*, 39 Pa. D. & C. 3d 593, 600 (Pa. C.P. 1985) (collecting cases from the Pennsylvania Courts of Common Pleas); *see Dziokonski v. Babineau*, 380 N.E. 2d 1295 (Mass. 1978) (plaintiff did not hear accident but arrived on scene immediately thereafter to witness serious injuries to child).

[192] *Betsinger v. D.R. Horton, Inc.*, 232 P.3d 433, 436 (Nev. 2010).

[193] *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002).

process; the Plaintiffs rely on this Court's decision in *Laxalt v. McClatchy*.[194]  Although actions taken after the filing of a complaint may constitute abuse of process, there are no allegations concerning the Defendants' post-filing conduct.  Merely filing a criminal complaint is insufficient to support a claim of abuse of process.  This claim is dismissed without prejudice.

### 5.    Respondeat Superior

The Defendants are correct that respondeat superior is not a cause of action but rather a theory of liability.[195]  Accordingly, this claim is dismissed.

### 6.    Supplemental Jurisdiction

Because I have not dismissed all of the Plaintiffs' federal law claims, supplemental jurisdiction over the remaining state law claims is appropriate.[196]

### H.    Punitive Damages

#### 1.    Section 1983 Claims

Punitive damages are not available against municipal entities for § 1983 claims.[197]  Therefore, punitive damages are unavailable against the cities of Henderson and North Las Vegas in relation to the § 1983 claims.

#### 2.    State Law Claims

In relevant part, NRS § 41.035(1) provides that

> [a]n award for damages in an action sounding in tort brought . . . against a present or former officer or employee of the State or any political subdivision . . . arising out of an act or omission within the scope of the person's public duties or employment may not exceed the sum of $100,000 . . . . An award may not include any amount as exemplary or punitive damages.

Accordingly, punitive damages are unavailable against the cities of Henderson and North Las Vegas because they are political subdivisions of the State of Nevada, and against the individual defendants because they are present or former employees of these cities.[198]

---

[194] 622 F. Supp. 737, 751–52 (D. Nev. 1985).

[195] *Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1029 (D. Nev. 2013).

[196] *See* 28 U.S.C. § 1367(a); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

[197] *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259–60 (1981).

III.     **CONCLUSION**

In accord with the foregoing, I hereby ORDER:

1.     The Defendants' Motion to Dismiss (Dkt. No. 17) is GRANTED IN PART and DENIED IN PART.

2.     All official-capacity claims against individual defendants under 42 U.S.C. § 1983 are dismissed.

3.     All claims against Chief Chambers are dismissed without prejudice.

4.     All claims against Chief Chronister are dismissed without prejudice.

5.     All claims against HPD Officers Poiner, Feola, and Walls are dismissed without prejudice.

6.     Qualified immunity is denied as to all named individual defendants.

7.     The Ninth Claim for Relief (§ 1983, malicious prosecution) is dismissed without prejudice as to the individual police officers.

8.     The Ninth Claim for Relief (§ 1983, malicious prosecution) is dismissed with prejudice as to Assistant City Attorney Reyes-Speer.

9.     The Seventh Claim for Relief (§ 1983, Third Amendment) is dismissed with prejudice.

10.     The Eleventh Claim for Relief (§ 1985(3)) is dismissed without prejudice.

11.     The Twelfth Claim for Relief (§ 1986) is dismissed without prejudice.

12.     The Seventeenth Claim for Relief (negligent infliction of emotional distress) is dismissed without prejudice.

13.     The Nineteenth Claim for Relief (abuse of process) is dismissed without prejudice.

14.     The Twenty-First Claim for Relief (respondeat superior) is dismissed with prejudice. However, the Plaintiffs may assert respondeat superior as a theory of liability at the proper time and upon the proper factual basis.

---

[198] *See Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 336–37 (9th Cir. 1995) (interpreting NRS § 41.035 to preclude punitive damages against political subdivisions and their officers and employees).

15.     The claims for punitive damages against the City of Henderson and the City of Las Vegas under 42 U.S.C. § 1983 are dismissed with prejudice.

16.     The claims for punitive damages for the state law claims against all defendants are dismissed with prejudice.

Dated: February 2, 2015.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE