# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

ANTHONY MITCHELL, *et al.*,

Plaintiffs,

v.

CITY OF HENDERSON, NEVADA, *et al.*,

Defendants.

Case No. 2:13-cv-01154-APG-CWH

**ORDER GRANTING IN PART AND DENYING IN PART THE NORTH LAS VEGAS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

(ECF No. 111)

This is a civil rights lawsuit brought by plaintiffs Anthony Mitchell, Linda Mitchell, and Michael Mitchell. The case arises out of a June 2011 incident involving City of Henderson police and the City of North Las Vegas Police Department SWAT team. The Henderson police were called to a domestic violence incident and responded to non-party Phillip White's house. White was inside the home with his infant child. North Las Vegas Police Department SWAT team members were called to the scene to assist. Officers noticed that residents in nearby houses, specifically the plaintiffs' homes, were photographing the police and were believed to be communicating with White about the police activity. The officers eventually forced their way into Anthony Mitchell's home, shot him with pepperball rounds, and arrested him. They also allegedly unlawfully entered Michael and Linda Mitchell's home, removed Linda from the home, searched their car without a warrant, and arrested Michael without probable cause, among other alleged violations.

The plaintiffs settled their claims with the City of Henderson defendants. ECF No. 108. Thus, the only remaining claims are against the City of North Las Vegas and its employees, Michael Waller, Drew Albers, David Cawthorn, Eric Rockwell, and Travis Snyder (collectively, the NLVPD defendants). The NLVPD defendants move for summary judgment on Anthony's claims against them. I grant the motion as to Anthony's claims for municipal liability and negligent hiring, training, and supervision, and I deny the rest of the motion. I also direct the

parties to meet and confer about what, if any, claims that are not addressed in the summary judgment briefing remain pending.

**I. BACKGROUND**

At approximately 7:30 a.m. on July 10, 2011, Phillip White had an argument with his wife Sussette. ECF No. 119-1 at 7. According to White, his wife pushed him, ran out of the house, and called the police. *Id.* at 7-8, 14. Sussette told the police that White hit her,[1] but she also told the police she did not believe White would harm their daughter. ECF Nos. 119-3 at 22; 119-2 at 5.

City of Henderson police officers arrived at the Whites' home at 363 Eveningside Avenue in Henderson. ECF Nos. 111-4 at 12; 119-1 at 5, 7. White answered the door and invited the officers inside but told them he would not come outside and leave his one-month-old daughter alone. ECF No. 119-1 at 7-8. White had a 3-inch pocketknife clipped to his pocket. *Id.* at 13. According to White, the officers did not tell him why they were there, but he assumed his wife had called them. *Id.* at 11. The police officers did not enter the house and walked away. *Id.*

White left the front door open, with the screen door closed, for approximately 45 minutes, but the officers did not accept his invitation to enter the house. *Id.* at 7-8. He sat on the couch with his daughter nearby until he closed the door when he needed to use the bathroom. *Id.* at 9. He then laid down and fell asleep without reopening the front door. *Id.* at 9, 11.

The plaintiffs in this case are White's neighbors. Plaintiff Anthony Mitchell lived at 367 Eveningside. ECF No. 111-4 at 12. His parents, Michael and Linda Mitchell, lived at 362 Eveningside. *Id.*

Anthony woke up that morning to sirens in his neighborhood. *Id.* He checked his phone and saw that he had missed a call from his father, so he called him back. *Id.* Michael told Anthony that he had spoken with White. *Id.* Michael advised Anthony that White had invited the police inside but that the police wanted White to leave the baby inside the house and come out, but White was not going to do that. *Id.* at 13.

---

[1] White denies striking his wife. ECF No. 119-1 at 14.

Anthony then went to his front door, opened it, and yelled at the officers to turn off their siren. *Id.* The officers shut off the siren. *Id.* Anthony then took a shower and exercised inside his house. *Id.* at 13-14. Some time later, he looked out his kitchen and garage windows to see if the police were still there. *Id.* at 14. They were, and Anthony began taking pictures of the officers on his cell phone. *Id.* Anthony saw Henderson police officers aim a rifle at his parents' house. *Id.* at 15. He spoke to his father on the phone, and Michael stated that an officer had pointed a rifle at him twice while Michael was taking photos of them. *Id.*

At approximately 10:10 a.m., NLVPD SWAT was called to assist the Henderson police. ECF No. 111-2 at 2. Defendants Michael Waller, David Cawthorn, Drew Albers, Eric Rockwell, and Travis Snyder were NLVPD officers that responded to the scene. ECF Nos. 111-2 at 2; 111-3 at 2; 119-5 at 7.

When NLVPD SWAT arrived, Lieutenant Cassell of the Henderson Police Department informed non-party NLVPD SWAT lieutenant Anthony DiMauro that they were responding to a domestic violence incident that "went south." ECF No. 111-3 at 2. Cassell also told DiMauro that White had weapons, was with his four-week-old baby inside his home, was refusing to come out, and had said that the police would have to come into the house and get him. ECF Nos. 111-2 at 2; 111-3 at 2. Additionally, Cassell told DiMauro that the occupants of 362 Eveningside (Michael and Linda Mitchell) were communicating with White and possibly providing him with tactical information about the police officers' locations and movements.[2] ECF Nos. 111-2 at 2; 111-3 at 2. The command post advised NLVPD SWAT that the occupants of 362 and 367 Eveningside were related. ECF No. 111-2 at 3.

Albers noticed someone inside the garage of 367 Eveningside (Anthony Mitchell) who was taking pictures or video of the police. *Id.* at 2. According to Cawthorn, the window was covered with a sunshade with a large square cut out of the middle. *Id.* Cawthorn characterized this window as a "sniper blind" because it allows the person behind the window to observe

---

[2] Anthony spoke with White once or twice that morning while the police were outside their homes. ECF No. 111-4 at 18. Anthony told White that Anthony had contacted the media and that SWAT was there. *Id.* Anthony denies that he told White how many officers were outside. *Id.* at 16.

activities outside the window while limiting observation of the person behind it. *Id.* at 2-3. Anthony describes the window as the border being covered by four pieces of reflective material on the top, bottom, and two sides, leaving a two by two foot opening in the middle. ECF No. 111-4 at 50.

According to Cawthorn, Albers ordered Anthony to move away from the window, but Anthony refused and extended his middle finger at Albers. ECF Nos. 111-2 at 3; 111-4 at 23. Anthony admits he made the middle finger gesture at the officers, but he denies that he heard any commands because the officers were located 40 to 60 feet away from his house. ECF No. 111-4 at 23, 26. Anthony continued to photograph and film the officers. ECF No. 111-2 at 2. According to Anthony, NLVPD SWAT officers were pointing rifles at him as he was taking pictures. ECF No. 111-4 at 16.

At some point, the police called Anthony and asked him if they could use his home for a better tactical advantage against White. *Id.* at 21. Anthony refused the request. *Id.* He then decided to put on a Kevlar vest and returned to his garage window to continue taking pictures. *Id.* at 16, 27. He also contacted the media about the situation. *Id.* at 18.

According to Cawthorn, Anthony's actions were a safety issue for the officers and divided their attention between White's residence and Anthony's. ECF No. 111-2 at 3. The officers therefore decided to attempt to contact Anthony. *Id.* The officers "plan[ned] to ask [Anthony] to leave and arrest him if he refused." *Id.*

Around noon, Albers, Snyder, Rockwell, and Cawthorn walked towards Anthony's front door. ECF Nos. 111-2 at 3; 119-2 at 11. According to Cawthorn, Albers saw Anthony through the garage window and ordered him to go to the front door. ECF No. 111-2 at 3. Anthony denies that any officer told him to go to the front door. ECF No. 111-4 at 56. The officers knocked on the front door but there was no response. ECF No. 111-2 at 3-4. Snyder twice stated "open the door," but there was no response. *Id.* at 4.

At that point, Rockwell forced the front door open using a metal ram. ECF No. 111-2 at 4. Anthony was in the living room area and talking on a cell phone with his mother. ECF Nos. 111-2

at 4; 111-4 at 17. The parties differ regarding what happened after the officers forced the door open.

According to Cawthorn, Snyder ordered Anthony to get on the ground, but Anthony did not do so and instead kept talking on his cell phone. ECF No. 111-2 at 4. Snyder ordered Anthony to get off the phone and get on the ground. *Id.* Anthony then got on the ground but continued to talk on the phone and turned away from the officers so they could not see his hands. *Id.* Snyder ordered Anthony to crawl to the front door and drop the phone. *Id.* Anthony was still turned away from the officers and did not drop his phone. *Id.* Cawthorn fired three pepperball rounds at Anthony, hitting him in the shoulder, buttocks, and lower back. *Id.* Anthony then dropped his phone, laid on the floor, and put his hands away from his body. *Id.* Cawthorn placed Anthony into custody and told Anthony that he was under arrest for obstructing a police officer. *Id.*

Anthony, however, testified that after the door was forced open, multiple officers simultaneously gave him orders to get on the ground, get off the phone, and to crawl towards them. ECF No. 111-4 at 17. According to Anthony, within a second or two of the officers ramming his door open and giving him these commands, he was shot with a pepperball under his armpit, which made him drop the phone and collapse to the floor. *Id.* at 17-18. He heard the officers yelling at him to shut off his phone and crawl to them when he was shot again with pepperball rounds. *Id.* at 17. Anthony disputes he continued to talk on the phone because he states he did not have the phone in his hand anymore once he was on the ground. *Id.* at 58. According to Anthony, there was no time to respond to the officers' commands before he was shot with the pepperballs. *Id.* at 18. Anthony put his hands over his head and curled up with his back facing the door so that they would not shoot him in the face if they shot him again. *Id.* at 18.

The officers did not shoot at him again, so he got onto his stomach and put his hands behind his back. *Id.* Two or more officers then forcefully dropped their knees onto his back and handcuffed him. *Id.* at 27-28. One officer took him outside and pressed his face into the stucco wall while other officers searched his home. *Id.* at 28. An officer stated to him "You want to flip

us off, huh?" *Id.* Another officer looked at that officer and said "Shhhh." *Id.* Anthony denies he was told why he was under arrest. *Id.* at 61.

Cawthorn turned Anthony over to the Henderson Police Department, and Anthony was booked into the Henderson Detention Center. ECF No. 111-2 at 4. The charges against Anthony were later dismissed with prejudice. ECF No. 111-4 at 36.[3]

The plaintiffs filed a twenty-two count first amended complaint (FAC) that included claims against both the Henderson defendants and the NLVPD Defendants. ECF No. 3. The federal claims in the FAC were:

(1) Retaliation in violation of the Free Speech Clause of the First Amendment, against all defendants;
(2) Unlawful arrest of Anthony Mitchell and unlawful search of Anthony's home and vehicle, in violation of the Fourth Amendment, against Doe Officers 1–10, 21–22, 24–30, Sergeant Waller, and Officers Albers, Cawthorn, Rockwell, and Snyder;
(3) Excessive force against Anthony Mitchell, in violation of the Fourth Amendment, against Doe Officers 1–10, Sergeant Waller, and Officers Albers, Cawthorn, Rockwell, and Snyder;
(4) Unlawful arrest of Michael Mitchell, in violation of the Fourth Amendment, against Doe Officers 31–35;
(5) Unlawful arrest of Linda Mitchell, in violation of the Fourth Amendment, against Doe Officers 21–30;
(6) Unlawful search of Michael Mitchell's and Linda Mitchell's home and of Michael's vehicle, in violation of the Fourth Amendment, against Doe Officers 21–30;
(7) Unlawful peacetime quartering of soldiers in Michael Mitchell's and Linda Mitchell's home, in violation of the Third Amendment, against Doe Officers 21–30;
(8)(a) Unlawful punishment of Anthony, in violation of the Eighth Amendment, against Does Officers 1–10, 32, and 55;
(8)(b) Unlawful punishment of Michael, in violation of the Eighth Amendment, against Doe Officers 21, 31–35;
(8)(c) Deliberate indifference to Anthony's medical needs, in violation of the Eighth Amendment, against Doe Officers 36 and 37;
(9) Malicious prosecution, in violation of the First, Fourth, and Fourteenth Amendments, against three Henderson defendants and Cawthorn;

---

[3] Because the motion at issue involves only Anthony's claims against the NLVPD defendants, a detailed discussion about what occurred with White, Michael Mitchell, and Linda Mitchell is unnecessary. It suffices to state that Michael and Linda Mitchell generally allege that during this same incident they were removed from their home; that officers unlawfully entered, searched, and remained in their home and searched their car and Linda's purse without a warrant, consent, or exigent circumstances; and that Michael was placed under arrest without probable cause. The charges against Michael were later dismissed. The police eventually made forcible entry into White's home, retrieved the baby, and placed White under arrest. The charges against White were later dismissed.

> (10) Municipal liability under *Monell*, against the City of Henderson and the City of North Las Vegas;
> (11) Conspiracy under 42 U.S.C. § 1985(3), against unspecified defendants; and
> (12) Neglect to prevent conspiracy under 42 U.S.C. § 1986, against unspecified defendants.

The remaining ten claims were based on Nevada state law:

> (13) Assault, against unspecified defendants;
> (14) Battery, against unspecified defendants;
> (15) False arrest and imprisonment, against unspecified defendants;
> (16) Intentional infliction of emotional distress, against unspecified defendants;
> (17) Negligent infliction of emotional distress, by inference against Doe Officers 1–10, Sergeant Waller, and Officers Albers, Cawthorn, Rockwell, and Snyder;
> (18) Civil conspiracy, against unspecified defendants;
> (19) Abuse of process, against unspecified defendants;
> (20) Malicious prosecution, against unspecified defendants;
> (21) Respondeat superior, against the City of Henderson and City of North Las Vegas; and
> (22) Negligent hiring, retention, supervision, and training, against the City of Henderson and City of North Las Vegas.

The City of Henderson defendants have settled. I previously dismissed the plaintiffs' claims against defendant NLVPD Chief Joseph Chronister. ECF No. 48 at 18-19. I also dismissed the claims in the FAC for malicious prosecution in counts nine and twenty, the Third Amendment in count seven, § 1985 conspiracy in counts eleven and twelve, negligent infliction of emotional distress in count seventeen, abuse of process in count nineteen, and respondeat superior in count twenty-one. *Id.* at 26, 31, 33, 36-37.

The NLVPD defendants move for summary judgment, identifying the following as the claims remaining against them:

> **count two**: unlawful arrest of Anthony Mitchell and unlawful search of Anthony's home and vehicle, in violation of the Fourth Amendment;
> **count three**: excessive force against Anthony Mitchell;
> **count ten**: municipal liability;
> **count thirteen**: assault;
> **count fourteen**: battery;
> **count fifteen**: false arrest and imprisonment;
> **count sixteen**: intentional infliction of emotional distress;
> **count eighteen**: civil conspiracy;
> **count twenty-two**: negligent hiring, retention, supervision, and training.

ECF No. 111 at 5. In response, the plaintiffs do not dispute that these are Anthony's remaining claims against the NLVPD defendants. Neither party explains why counts one and eight are no longer pending for Anthony (although likely at least some, if not all, of the allegations in count

eight no longer apply because they were directed at Anthony's post-arrest detention by the Henderson police). Additionally, the plaintiffs assert in their opposition that because the NLVPD defendants did not move for summary judgment against Michael and Linda Mitchell, their claims remain pending. ECF No. 119 at 2. The NLVPD defendants do not respond to this assertion in their reply.

After the NLVPD defendants moved for summary judgment, the plaintiffs were granted leave to file a second amended complaint. Although directed to file it, the plaintiffs never did. *See* ECF No. 131. Because the parties have briefed the claims in the FAC, I will likewise refer to the claims in the FAC in resolving this motion.

But because there is some confusion about what claims remain pending, I direct the parties to meet and confer, and to file a joint status report on the following: (1) whether the First Amendment retaliation claim in count one remains pending on behalf of Anthony against the NLVPD defendants; (2) whether the Eighth Amendment deliberate indifference claim in count eight remains pending on behalf of Anthony against the NLVPD defendants; and (3) whether any claim remains pending on behalf of Michael or Linda Mitchell against the NLVPD defendants.

## II. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, discovery responses, and affidavits demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). I

view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

## III. SECTION 1983 CLAIMS

To establish liability under 42 U.S.C. § 1983, a plaintiff must show the violation of a right secured by the Constitution and laws of the United States, and must show that the deprivation was committed by a person acting under color of state law. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). The NLVPD defendants do not contest that they acted under color of law. Thus, the dispute centers on whether they violated Anthony's constitutional rights.

The parties also dispute whether the individual NLVPD defendants are entitled to qualified immunity. To allay the "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties," government officials performing discretionary functions may be entitled to qualified immunity for claims made under § 1983. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In ruling on a qualified immunity defense, I consider whether the evidence viewed in the light most favorable to the nonmoving party shows the defendant's conduct violated a constitutional right. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). If the plaintiff has shown the defendant violated a constitutional right, I then must determine whether that right was clearly established. *Id.*

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (emphasis omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). I make this second inquiry "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. An officer will be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable. *Wilkins*, 350 F.3d at 955.

**A. Fourth Amendment Violations Related to Anthony's House, Vehicle, and Arrest**

Count two asserts the defendants violated Anthony's Fourth Amendment rights by unlawfully entering into his house and searching his house and car without consent, a warrant, or probable cause, and no exigent circumstances existed to dispense with the need to obtain a warrant. It also alleges the defendants seized and arrested Anthony in his home without a warrant, probable cause, or exigent circumstances.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (quotation omitted). However, there are two exceptions to the warrant requirement for searches of the home: (1) emergency and (2) exigency. *Id.*

"The emergency exception stems from the police officers' community caretaking function and allows them to respond to emergency situations that threaten life or limb." *Id.* (quotation and internal quotation marks omitted). Under the emergency exception, a "police officer may not enter a home to investigate a medical emergency or other immediate risk to life or limb unless he has reasonable grounds to believe an emergency is at hand and that his immediate attention is required." *Id.*

Under the exigency exception, police officers may "enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Id.* (quotation omitted). Under this exception, the government bears the burden of showing that (1) "the officer had probable cause to search the house" and (2) "exigent circumstances justified the warrantless intrusion." *Id.* at 766-67 (quotation omitted).

Viewing the facts in the light most favorable to Anthony, a reasonable jury could find the officers violated his Fourth Amendment rights. They entered his home, and searched and seized him without a warrant. The entry and seizure therefore are presumptively unreasonable.

A reasonable jury could find facts that would not support either an emergency or exigency exception to overcome that presumption. First, a genuine dispute remains about whether the officers had reasonable grounds to believe an emergency was at hand that required immediate entry into Anthony's home. The NLVPD defendants characterize the situation as a dangerous "barricade/hostage" situation, but White invited the officers into his home and then left his door open and remained visible for forty-five minutes. His wife told police he was not a threat to the child's safety. Anthony was taking pictures of the officers, but there is no evidence he threatened them or displayed weapons towards them. And while the officers may have suspected he was conveying information to White, a reasonable jury could conclude the officers had no information to support that suspicion.

A genuine dispute remains about whether there was an emergency at the moment the officers chose to enter Anthony's house, rather than during the prior four hours the incident had been unfolding. When the officers first arrived at the scene, Sussette was out of White's home and thus was not in danger. She told the officers White would not harm the child. Even if the officers believed Anthony was distracting them or was conveying information to White, a reasonable jury could conclude that nothing happened in the intervening four hours that would have provoked an emergency response at the time the officers decided to move on Anthony's home. Indeed, a reasonable jury could find there was ample time for the officers to obtain a warrant before breaking down Anthony's door and placing him into custody. For similar reasons, a reasonable jury could find there were no exigent circumstances that justified the warrantless intrusion. Further, a genuine dispute remains about whether the police officers had probable cause to believe that Anthony had committed a crime because Anthony denies that he disobeyed officer commands. Nev. Rev. Stat. § 197.190 (obstructing a police officer); *see also id.* § 197.090 (interfering with a public officer "by means of any threat, force or violence" or "knowing[] resist[ance] by force or violence").

The NLVPD defendants are not entitled to qualified immunity. As discussed in my prior order on the motion to dismiss (ECF No. 48) and as set forth above, the law on warrantless entries

into the home, and the exceptions thereto, was clearly established before this incident. I therefore deny the NLVPD defendants' motion for summary judgment on this claim.

**B. Excessive Force**

Count three alleges the NLVPD defendants used excessive force before entering Anthony's house when they pointed loaded firearms at him. It also alleges the officers used excessive force after entering his home when they fired pepperball rounds at him, dropped a knee into his back while cuffing him, and pressed his face against the stucco wall.

Excessive force in the course of an arrest is analyzed under the Fourth Amendment. *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). In determining the reasonableness of a non-deadly-force seizure, I balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003) (quotations omitted). This entails a three-step analysis. *Id.* First, I assess "the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Id.* Second, I assess "the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* Third, I weigh the gravity of the intrusion against the government's interest to determine whether the amount of force was constitutionally reasonable. *Id.*

The reasonableness inquiry looks at all the relevant objective facts and circumstances that confronted the arresting officers in each particular case, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) (quotation omitted); *Smith*, 394 F.3d at 701. Additionally, the reasonableness analysis must consider the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

situation." *Drummond*, 343 F.3d at 1058 (quotation omitted). Because the reasonableness balancing test "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," courts should grant summary judgment in excessive force cases "sparingly." *Id.* at 1056. "This is because police misconduct cases almost always turn on a jury's credibility determinations." *Id.* However, I may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was objectively reasonable under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (internal quotation omitted).

Genuine disputes remain about whether the NLVPD defendants used excessive force. Viewing the facts in the light most favorable to Anthony, Albers pointed a loaded weapon at Anthony when Anthony was taking pictures of the police activity. Anthony was not suspected of any crime at that time and he did not threaten the officers or display weapons at them. He was not actively resisting arrest or attempting to flee.

The officers later forced their way into Anthony's home and shot Anthony with pepperballs, forcefully dropped knees onto his back, and shoved his face into a stucco wall. Viewing the facts in the light most favorable to Anthony, he posed little to no risk to the officers when they entered through the front door. He was unarmed and the officers did not give him time to respond to multiple simultaneous commands before he was shot with pepperballs. He testified he was lying on his stomach with his arms behind his back when one or more officers dropped their knees onto his back. Additionally, he was restrained and not resisting when his face was pushed into a stucco wall and held there. The crimes that the NLVPD defendants rely on to justify their behavior are misdemeanors. Nev. Rev. Stat. § 197.190 (obstructing a police officer, a misdemeanor); *id.* § 197.090 (interfering with a public officer, a gross misdemeanor). A reasonable jury could find the level of force outweighed the governmental interests at stake. Further, the officers are not entitled to qualified immunity. *See, e.g.*, *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010); *Tekle v. United States*, 511 F.3d 839, 845 (9th Cir. 2007); *Frunz v. City of Tacoma*, 468 F.3d 1141, 1143 (9th Cir. 2006); *Robinson v. Solano Cnty.*, 278

F.3d 1007, 1014 (9th Cir. 2002) (en banc). I therefore deny the NLVPD defendants' motion on this claim.

### C. *Monell* Liability

Count ten alleges the constitutional violations were the result of unwritten NLVPD polices of summarily violating individuals' constitutional rights as punishment for either not obeying police orders or for exercising their First Amendment rights in filming police conduct or expressing their opinion about police conduct; searching homes and ordering citizens to leave their homes without legal justification; and covering up police misconduct. Anthony also alleges NLVPD's chief of police failed to train, supervise, and discipline officers, resulting in the constitutional violations.

"Municipalities, their agencies, and their supervisory personnel cannot be held liable under section 1983 on a theory of respondeat superior." *Shaw v. State of Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 610 (9th Cir. 1986). But these entities may be held liable for "deprivations of constitutional rights resulting from their policies or customs." *Id.* Thus, a plaintiff suing a municipality or its agency must establish both a constitutional deprivation and the existence of a municipal custom or policy that caused the deprivation. *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).

"A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006). A plaintiff making such a claim must show the training program is inadequate and the inadequate training represents municipal policy. *Id.* However, evidence the municipality failed to train one officer is insufficient to establish a municipality's deliberate policy. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007). Rather, the inadequate training must be widespread. *Id.*

A plaintiff may prove a municipal policy was the moving force behind a constitutional violation in three ways: (1) the municipality adopted an express policy; (2) a municipal employee commits a constitutional violation pursuant to the municipality's longstanding practice or custom; or (3) the person causing the violation has final policymaking authority. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003). A pattern of tortious conduct by inadequately trained employees may show inadequate training is the moving force behind a plaintiff's injury. *Long*, 442 F.3d at 1186-87. Alternatively, a plaintiff may establish failure-to-train even without showing a pattern where a "violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (quotation omitted).

Anthony does not cite to any evidence of a policy, custom, or practice that was the moving force behind the alleged constitutional violations. Instead, he argues the NLVPD defendants were trained at the same academy as the Henderson police officers, and the Henderson Police Department enacted policy changes in response to this incident. He argues it is thus "reasonable to assume" that NLVPD's policies caused the constitutional violations in this case.

This is insufficient at summary judgment. First, Anthony does not offer evidence that the two police departments train at the same academy. Moreover, Anthony's unsupported assumption cannot raise a genuine issue of fact. The fact that Henderson changed its policies does nothing to show whether NLVPD had the same policies or whether those policies were constitutionally deficient. Moreover, Anthony does not identify what policy is at issue, much less point to evidence raising a genuine dispute that the policy both existed and was the moving force behind the violations. He has identified only this incident as evidence of inadequate training, but a single incident generally does not suffice to show a widespread deficient training program. He presents no evidence on what training the officers received or how that training was deficient. Consequently, he has not presented evidence raising a genuine issue on the *Monell* claim, and I therefore grant the NLVPD's motion for summary judgment on this claim.

### IV. STATE LAW CLAIMS

**A. Discretionary Immunity**

To receive discretionary immunity under Nevada Revised Statutes § 41.032(2), a public employee's decision "must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 168 P.3d 720, 729 (2007) (en banc). The Supreme Court of Nevada looks to federal decisional law on the Federal Tort Claims Act for guidance on what type of conduct discretionary immunity protects. *Id.* at 727-28.

The United States Court of Appeals for the Ninth Circuit and other circuits have held that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (citing cases). Thus, the NLVPD defendants are entitled to discretionary immunity on Anthony's negligent training and supervision claim in count twenty-two. I therefore grant the NLVPD defendants' motion as to that claim.

However, "[d]ecisions regarding the amount of force to use are not the kind of policy decisions the discretionary-function exception was designed to shield." *Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, 51 F. Supp. 3d 999, 1013 (D. Nev. 2014). Further, acts taken in violation of the Constitution or in bad faith are not discretionary. *Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2011); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000); *Falline v. GNLV Corp.*, 823 P.2d 888, 892 n.3 (Nev. 1991). For example, "where an officer arrests a citizen in an abusive manner not as the result of the exercise of poor judgment as to the force required to make an arrest, but instead because of hostility toward a suspect or a particular class of suspects (such as members of racial minority groups) or because of a willful or deliberate disregard for the rights of a particular citizen or citizens, the officer's actions are the result of bad faith and he is not immune from suit." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir. 2007).

Genuine disputes remain about the constitutionality of the NLVPD's actions. Moreover, viewing the facts in the light most favorable to Anthony, a reasonable jury could find the officers acted in bad faith with a motive to retaliate against Anthony for photographing them and making

a rude gesture at them. According to Anthony, one of the officers specifically mentioned the fact that Anthony made a rude gesture to them. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1022 (9th Cir. 2015) (stating officers cannot rely on the "offense of 'contempt of cop,' in which officers charge resisting arrest or failure to obey or other minimal procedural offenses simply to punish or exact retribution on disrespectful or non-submissive individuals"). The NLVPD defendants therefore have not shown they are entitled to discretionary immunity on the other state law claims.

### B. Assault and Battery

Counts thirteen and fourteen allege assault and battery. Count fifteen alleges false arrest and imprisonment.

"Under Nevada law, a police officer is privileged to use the amount of force reasonably necessary." *Vasquez-Brenes*, 51 F. Supp. 3d at 1014. However, "[a]n officer who uses more force than is reasonably necessary is liable for battery." *Id.*; *see also Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996) (applying Nevada law). Thus, the standard for assault and battery by a police officer under Nevada law is the same as under a § 1983 claim. *Vasquez-Brenes*, 51 F. Supp. 3d at 1014; *Ramirez*, 925 F. Supp. at 691. Because genuine disputes remain about whether the NLVPD defendants used reasonable force, I deny the NLVPD defendants' motion for summary judgment on these claims.

### C. False Arrest and Imprisonment

"To establish false imprisonment of which false arrest is an integral part, it is . . . necessary to prove that the [plaintiff was] restrained of his liberty under the probable imminence of force without any legal cause or justification." *Garton v. City of Reno*, 720 P.2d 1227, 1228 (Nev. 1986) (quotation omitted). Probable cause may provide legal justification for an arrest to defeat claims of false arrest and false imprisonment. *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981). However, as discussed above, a genuine dispute remains about whether the officers had probable cause to arrest Anthony. I therefore deny the NLVPD defendants' summary judgment motion as to this claim.

## D. Intentional Infliction of Emotional Distress

Count sixteen alleges intentional infliction of emotional distress (IIED). Under Nevada law, IIED requires three elements: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Olivero v. Lowe*, 995 P.2d 1023, 1025 (Nev. 2000).

The NLVPD defendants move for summary judgment on this claim on the basis that their conduct does not rise to the level of extreme and outrageous conduct. Outrageous conduct is behavior that goes "outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (quotation omitted). The Supreme Court of Nevada has referred to the Restatement (Second) of Torts § 46 as relevant authority for IIED claims under Nevada law. *See, e.g.*, *Olivero*, 995 P.2d at 1027; *Selsnick v. Horton*, 620 P.2d 1256, 1257 (Nev. 1980). A police officer's conduct may rise to the level of extreme and outrageous when he engages in an "extreme abuse" of his position. Restatement (Second) of Torts § 46, cmts. The comments to the Restatement offer examples of when a police officer's conduct may be so outrageous as to support an IIED claim, such as where the officer attempts to extort money by a threat of arrest or attempts to extort a confession by falsely telling the accused her child has been injured in an accident and she cannot go to the hospital until she confesses. "The Court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the jury determines whether the conduct was extreme and outrageous enough to result in liability." *Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009).

Viewing the facts in the light most favorable to Anthony, reasonable people could differ as to whether the officers' conduct rises to the level of extreme and outrageous. Taking Anthony's version of the facts as true, the officers aimed loaded weapons at him when he was unarmed and posed no immediate threat, forcibly entered his home without a warrant and without an emergency or exigency supporting the entry, shot him with pepperballs when he posed no

immediate threat to the officers, forcefully dropped a knee into his back to handcuff him even though he was not resisting, and shoved his face into a stucco wall at a time when he was restrained and not resisting. Additionally, a reasonable jury could find the officers acted with the intent to punish Anthony because he was photographing them and made a rude hand gesture at them. I cannot say as a matter of law that this conduct does not rise to the level of an extreme abuse of police power. I therefore deny the NLVPD defendants' motion for summary judgment on this claim.

### E. Civil Conspiracy

Count eighteen alleges civil conspiracy. Under Nevada law, a civil conspiracy "consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Consol. Generator-Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998) (quotation omitted). Thus, to establish a civil conspiracy claim, a plaintiff must show: (1) the commission of an underlying tort; (2) an agreement between the defendants to commit that tort; and (3) resulting damages. *Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety*, 110 P.3d 30, 51 (Nev. 2005), *overruled on other grounds by Buzz Stew, LLC v. City of N. Las Vegas*, 181 P.3d 670, 672 n.6 (Nev. 2008). The agreement may be shown through direct or circumstantial evidence. *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 335 P.3d 190, 199 (Nev. 2014) (en banc).

Genuine disputes remain about whether the NLVPD defendants committed underlying torts. Additionally, there is a genuine dispute about whether the officers reached an agreement to commit those torts. Cawthorn stated the officers developed a plan to ask Anthony to leave and to arrest him if he refused to do so. Thus, there is evidence the officers agreed on some plan related to Anthony's treatment. They approached the house together and acted in coordinated fashion. The circumstantial evidence of the warrantless, non-exigent entry into the home; the near immediate use of force; followed by the shoving of Anthony's face into the stucco after he was compliant; and an officer specifically referring to Anthony making a rude gesture at the officers

only to be shushed by his fellow officer could lead a reasonable jury to conclude that the defendants developed a plan to punish Anthony for a perceived lack of the appropriate level of respect and submissiveness to police officers. I therefore deny the NLVPD defendants' motion for summary judgment on this claim.

## V. CONCLUSION

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **(ECF No. 111) is GRANTED in part and DENIED in part**. The NLVPD defendants are entitled to summary judgment on plaintiff Anthony Mitchell's claims for *Monell* liability in count ten and negligent hiring, retention, and supervision in count twenty-two of the First Amended Complaint. The motion is denied in all other respects.

IT IS FURTHER ORDERED that the parties shall meet and confer, and on or before July 28, 2017, shall file a joint status report on the following: (1) whether the First Amendment retaliation claim in count one remains pending on behalf of Anthony Mitchell against the NLVPD defendants; (2) whether the Eighth Amendment deliberate indifference claim in count eight remains pending on behalf of Anthony Mitchell against the NLVPD defendants; and (3) whether any claim remains pending on behalf of Michael or Linda Mitchell against the NLVPD defendants.

DATED this 3rd day of July, 2017.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE